UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 315 |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| JOHN DENNIS HASTERT | ) | |

## GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS

Defendant John Dennis Hastert withdrew $1.7 million in cash in four and a half years. A large portion, $952,000, was in mostly $9,000 increments withdrawn on 106 separate occasions. On October 28, 2015, pursuant to a written plea agreement, defendant pled guilty to a structuring violation related to these cash withdrawals. Defendant acknowledged in his plea agreement that he "told agents that he was keeping the cash he had been withdrawing in a safe place. [Defendant] made these statements to mislead the agents as to the actual purpose of the withdrawals and what he had done with the money." Plea Agreement at ¶ 6.

The investigation of defendant began because his structuring activity raised concerning questions. What was the actual purpose of withdrawing so much cash and what did defendant do with the money? Was defendant, the former Speaker of the United States House of Representatives, a victim of extortion? Was defendant, a lobbyist in communication with domestic and foreign business and political leaders, committing a crime through illegal use of the money? The answer, as it turned out, after a lengthy investigation, was neither of these things. The actual purpose of the withdrawals was to pay an agreed-upon total of $3.5 million to compensate

Individual A for sexual abuse of Individual A committed by defendant when Individual A was 14 years old and defendant was his wrestling coach.

The federal and state statutes of limitations have long expired on potential charges relating to defendant's known sexual acts against Individual A and other minors. These known acts consist of the defendant's intentional touching of minors' groin area and genitals or oral sex with a minor. With this case, the government seeks to hold defendant accountable for the crimes he committed that can still be prosecuted: defendant's structuring of cash withdrawals and his lies to the government about that activity. But those crimes, while recent, have their origin in the defendant's past. The actions at the core of this case took place not on the defendant's national public stage but in his private one-on-one encounters in an empty locker room and a motel room with minors that violated the special trust between those young boys and their coach.

## I.    SENTENCING GUIDELINES CALCULATIONS

The government agrees with the Probation Officer that the defendant's advisory range under the Sentencing Guidelines is 0-6 months. The Probation Officer correctly found this to be the appropriate range pursuant to Guideline § 2S1.3(b)(3) because the defendant's actions constituted one occasion of structuring as the Seventh Circuit defined "occasion" in *United States v. Davenport*, 929 F.2d 1169 (7th Cir. 1991).[1]

---

1       The PSR adds a two-point enhancement for obstruction of justice and does not give defendant

2

## II.   SECTION 3553 FACTORS

### A.   Nature and Circumstances of the Offense

In April 2012, a bank compliance officer reviewed defendant's bank records while preparing for a routine exam unrelated to defendant. The official noticed unusual account activity (seven $50,000 cash withdrawals between June 2010 and April 2012 at a branch of the bank in Yorkville, Illinois) and referred the matter to the bank's risk management department. A risk management officer asked bank officials in the Yorkville branch to request information from defendant regarding his transactions. A teller supervisor contacted defendant. The teller supervisor told defendant that the bank needed to understand his transactions pursuant to the PATRIOT Act, and handed him a pamphlet that explained that the bank had to file currency transaction reports for cash transactions over $10,000. The pamphlet also explained that it was illegal to structure transactions to evade the reporting requirements. Defendant took the pamphlet from the teller supervisor.[2]

Defendant contacted the risk management officer as requested. During a phone conversation, the risk management officer told defendant that the bank had noticed the large cash withdrawals and was required by law to understand its

---

a two-point reduction for acceptance of responsibility, which results in an adjusted offense level of 8. The advisory Guideline range is the same, however, whether the Court accepts the offense level contemplated by the parties in the Plea Agreement or the offense level set forth in the PSR.

2    The teller supervisor had already, on her own initiative, asked defendant about the reason for his $50,000 withdrawals on more than one occasion when he came to the bank to make his cash withdrawals. During at least one of these conversations, defendant told her that he collected vintage cars and needed the cash to purchase cars.

3

customers' banking activity. Defendant initially told the risk management officer that the withdrawals were none of his business. When the risk management officer pressed further, defendant said that he was withdrawing the cash for investments and to buy stocks and also because he wanted to keep his cash deposits under the Federal Deposit Insurance Corporation insurance limits. The risk management officer told defendant that his explanations did not make sense, *i.e.*, one cannot buy stocks with cash, and the risks associated with possessing large amounts of currency far outweigh the risks of a bank failure. Defendant provided no further explanation. The risk management officer explained to defendant the bank's obligations under the Bank Secrecy Act and the PATRIOT Act. Defendant stated that he was aware of the law, but that the PATRIOT Act was just for terrorism and he (defendant) was not a terrorist.

Following defendant's conversations with the two bank officials, the officials noticed that defendant's banking activity changed. Defendant did not withdraw any money between the April 2012 conversations with the bank officials and July 2012. Once defendant resumed his withdrawal activity, he no longer withdrew $50,000 at a time but instead withdrew cash in $9,000 increments. In February 2013, ten months after speaking with defendant, the bank decided to close defendant's account due to his suspicious activity and refusal to provide what the bank deemed to be a sufficient explanation for the withdrawals. The teller supervisor called defendant and told him the bank had decided to close his account. Defendant closed his account before the

4

bank closed it involuntarily. When defendant came to the bank to close the account, the teller supervisor handed him another copy of the pamphlet describing currency transaction reports and structuring that she had previously given him.

*Defendant's Withdrawal Activity*

In early 2013, the FBI and IRS learned about defendant's withdrawal activity at the bank and two other banks at which defendant had accounts. The government learned that, in addition to the banking activity described above, defendant had been withdrawing $50,000 in cash from these other two banks as well. Between June 1, 2010 and April 13, 2012, defendant had withdrawn $750,000 in cash from these three banks in $50,000 increments. After defendant's conversations with the bank officials, defendant also stopped withdrawing $50,000 in cash from the other two banks. And, as he had started doing at the Yorkville branch bank, defendant began withdrawing $9,000 at a time from these other two banks. In July 2012, defendant also opened up an account at a fourth bank from which he immediately began withdrawing cash in $9,000 increments.

Based on defendant's banking activity, it appeared obvious that defendant had begun structuring his withdrawals to evade reporting requirements in violation of the structuring laws. But defendant's activity raised questions beyond the apparent fact of the structuring violations. Defendant was the former Speaker and he was then working as a high-profile lobbyist with business in foreign countries. Law enforcement was concerned that defendant's large and unusual cash withdrawals

5

could be indicative of other criminal activity of which defendant was either a perpetrator or a victim. The government therefore began a thorough investigation into defendant and his possible uses for the large sums of cash.

*December 8, 2014 Interview with Defendant*

By December 2014, the government had exhausted all reasonable avenues for determining why defendant had been structuring his withdrawals and how he had been using the cash. By this time, defendant had withdrawn a total of $1.7 million in cash in approximately four and a half years. Of that cash, $952,000 was in mostly $9,000 increments withdrawn on 106 separate occasions. Other than the brief pause after being approached by bank officials in April 2012, defendant's frequent cash withdrawals had not abated. The defendant's motives for structuring withdrawals were important to the direction of the government's investigation and to any ultimate charging decision.

Therefore, on December 8, 2014, FBI agents interviewed defendant at his home in Plano. The government was not aware of sexual abuse allegations at the time of the interview. During the interview, defendant responded to questions by stating or confirming that: (1) he was withdrawing money in $9,000 increments because the bank had given him "a real hassle" about taking out $50,000 at a time; (2) he was aware that the bank had a $10,000 threshold for reporting cash transactions; (3) he did not want the bank "calling [him] up all the time"; (4) he was not in "any kind of trouble"; (5) he was taking cash out because he did not think the

banks were safe; and (6) he was keeping the cash "in a safe place," though he would not specify its location.

*February 27, 2015 Proffer Interview with Defendant*

Shortly after the December 8, 2014 interview, defendant's counsel contacted the government and said that defendant was the victim of an extortion plot and would cooperate with the government's investigation. The alleged extortion plot, as described by defendant's counsel, involved an alleged false claim by Individual A, a former Yorkville High School student and wrestler, that defendant inappropriately touched him during a wrestling trip decades ago and, for this alleged misconduct, Individual A demanded $3.5 million from defendant. On February 27, 2015, law enforcement interviewed defendant pursuant to a proffer agreement with the government and, consistent with his attorney's description, defendant alleged that he had been making cash payments to Individual A as a result of an extortion plot.[3] At the conclusion of the interview, defendant agreed to cooperate with law enforcement by recording his conversations with Individual A.

*The Government's Investigation of Individual A*

In response to defendant's allegations, the government began investigating whether Individual A was extorting the defendant. As part of that investigation, the

---

[3]     The proffer agreement required defendant to tell the truth. Despite the fact that the government has determined that defendant was not truthful during the proffer, the government is not seeking to utilize the information provided during the proffer in aggravation of defendant's sentence. The information provided during the proffer, however, provides necessary context for the government's post-proffer investigative steps, and the government is providing this information so the Court can consider it for that purpose.

government, among other things, reviewed Individual A's banking activity and recorded certain telephone conversations.

*March 2, 2015 Recording*

In early March 2015, defendant contacted law enforcement to report that Individual A sent him a text message to arrange a meeting so that defendant could give Individual A the next $100,000 payment. On March 2, 2015, agents met with defendant to prepare him to make a recorded phone call to Individual A. The agents directed defendant to tell Individual A that he was having problems with banks closing his accounts due to his withdrawal activity. Defendant placed the call on March 2, 2015 and agents recorded the call. Defendant told Individual A that he needed more time to get the money. Defendant and Individual A agreed that Individual A would text him in a few weeks.

This was the first time agents and prosecutors heard Individual A speak. Individual A's tone and comments during the recorded conversation were inconsistent with someone committing extortion. Instead of objecting to defendant's request, for example, Individual A expressed understanding for defendant's supposed need for more time to come up with the money. Individual A did not make any threats, implicit or explicit, nor did he seem angry that defendant was asking for more time to get the money.

*March 22, 2015 Recording*

On March 22, 2015, defendant made another recorded phone call to Individual A. The agents gave defendant different instructions than they had given him before the March 2, 2015 phone call. The government had by this time obtained bank records about Individual A, which reflected deposits of cash into Individual A's account at intervals generally consistent with defendant's cash withdrawals. The agents explained to defendant before the call that this time they wanted defendant to push back against Individual A and say he did not want to pay Individual A anymore. The agents asked defendant to say that Individual A had falsely accused him, defendant had paid him a lot of money, and defendant wanted it to end. One of the agents told defendant that, because defendant was claiming Individual A was extorting him, they wanted to see if Individual A would make extortionate threats when denied the money he had purportedly demanded. The agents specifically told defendant that he should not use the banks' closing his accounts as an excuse as to why he could not pay in order that Individual A would understand defendant had decided on his own not to pay.

Instead, during the call, defendant repeated to Individual A the same story from the prior recording. Once again, Individual A's language and demeanor during this second recorded call were inconsistent with an individual extorting defendant through threats to make a false accusation public or even to make a true accusation public. Individual A did not say anything that could be construed as a threat.

9

Individual A referred repeatedly to "promises" defendant had made, their "agreement," that they both understood it was a "private, personal matter," and that it was "nobody else's business." Individual A noted during the call that if getting $100,000 out of the bank was causing trouble for defendant, they could slow down and come up with a more reasonable amount. Individual A told defendant that they had to have their stories straight about what they would say if a third party asked about their agreement, since they both wanted to keep it private. Individual A said that he had wanted to involve lawyers from the beginning to make their agreement "legal," but that defendant had refused. Individual A recounted that he had wanted to bring in two close confidantes of defendant at the beginning to help them reach an agreement, but defendant had refused. Individual A said that people "buy their way out of trouble all the time," and that there had to be a way to do it. Individual A said that he had relied on defendant, who had been in Congress and had lawyers at his disposal, to help structure their agreement. Individual A referred during the conversation to a "lock box" (*i.e.*, safe deposit box) in which defendant had agreed to place stock or money so that their agreement could be fulfilled if defendant died.

*Information Provided by Individual A*

The March 2015 recordings cast doubt on defendant's claim that he was the victim of extortion. Therefore, on March 27, 2015, agents approached Individual A and interviewed him that day (and several times thereafter). The agents did not tell

Individual A that his March 2015 conversations with defendant had been recorded. The following is a summary of the information Individual A provided.

Individual A met defendant through Individual A's family members when Individual A was a child. Individual A wrestled all four years in high school with defendant as his coach. At one point, defendant told Individual A that he could attend a wrestling camp with the team. There were between 10 and 14 boys on the trip, and defendant was the only adult. The team stayed two nights in a motel on the return trip. The defendant told Individual A he would stay in defendant's room while the other boys stayed in another room. Individual A did not know why defendant singled him out.

When it was time for bed, Individual A went to defendant's motel room. Earlier in the trip, Individual A had complained about a groin pull. While in the motel room, defendant asked about Individual A's injury and said he wanted to check on it. Defendant told Individual A to lie down on the bed and take off his underwear. Defendant then began massaging Individual A's groin area. It became clear to Individual A that defendant was not touching him in a therapeutic manner to address a wrestling injury but was touching him in an inappropriate sexual way. A few moments later, Individual A jumped off the bed, grabbed his underwear, and ran across the room to slouch in a chair. Individual A was confused and embarrassed about his physical reaction to defendant's contact with him, and he apologized to defendant. Defendant then asked Individual A to get on his (defendant's) back and

11

give him (defendant) a massage. Individual A was nervous about what had happened and what was going on and did not know what to do. Defendant lay on the bed in only his underwear, and Individual A gave him a back massage. They then went to sleep in the same bed.

The team stayed a second night in the same motel. Individual A was determined that defendant would never again put him in the position in which he found himself the previous night. When defendant came to the other boys' room and told Individual A to go to defendant's room, Individual A refused to go.

Around 2010, Individual A began thinking about confronting defendant. Individual A made an appointment with defendant and asked defendant why he had done it. After a long pause, defendant said that it was a confusing and difficult time in his life. Individual A asked how many other kids defendant molested. Defendant said there were only two, one of whom defendant understood as himself. Defendant and Individual A agreed to meet again.

Defendant and Individual A met again within a week or two. Individual A told defendant he wanted $3.5 million for what defendant had done to him. Individual A described to the agents, just as Individual A had said to defendant during the March 22, 2015 recorded conversation, that he suggested to defendant that they involve individuals whom defendant trusted or a lawyer to work out the settlement. Individual A suggested that defendant tell his wife. Defendant refused these

12

suggestions and said he did not want to involve others or to write anything down. Defendant did not negotiate or argue about the amount and agreed to pay.

Defendant said that he could possibly pay Individual A the settlement amount by giving him stock he owned in a privately-held company. Defendant said that could be the easiest way, because defendant could just sign over his shares. Defendant said the stock could double or even triple in value. Defendant said the stock was supposed to go public in six months, and the shares could not be transferred until then. Defendant said he would give Individual A $50,000 in cash in the meantime.

The first time defendant gave Individual A cash was at defendant's office in Yorkville. Defendant told Individual A not to buy any big-ticket items with the money. Individual A understood that defendant did not want to attract any attention because he wanted the agreement to remain private. When it became clear that the company in which defendant had stock was not going public any time soon, Individual A and defendant agreed to meet every month and a half for defendant to give Individual A $50,000. Later, they changed their arrangement so they would meet every three months and defendant would give Individual A $100,000. At some point after defendant and Individual A entered into the agreement, Individual A asked defendant what would happen if defendant died. Defendant told Individual A that he had a safe deposit box and the agreement would be fulfilled, but did not say specifically what was in the safe deposit box. Only later did Individual A realize that defendant had no plan to continue to pay Individual A if defendant died.

13

After the first payment at defendant's office, all of the subsequent meetings were in the parking lot of a store in Yorkville. Defendant and Individual A communicated through text messages to arrange the meetings. These regular payments—totaling around $1.7 million—continued until December 2014.

*Information Provided by Individual B*

Individual B was a wrestler at Yorkville High School for defendant. One day during his freshman year, when Individual B was 14 years old, Individual B was alone in the locker room with defendant after Individual B had worked out. Either just after Individual B showered or while Individual B changed by his locker, defendant told Individual B to get on a table so defendant could "loosen him up." Individual B lay on the table face-down and defendant started massaging him. Defendant had Individual B turn over so Individual B was lying face-up on the table. Defendant then performed a sexual act on Individual B.

*Information Provided by Individual D*

Individual D was a member of defendant's Yorkville High School wrestling team. Individual D recalled that defendant put a "Lazyboy"-type chair in direct view of the shower stalls in the locker room where he sat while the boys showered. One day when Individual D was 17 years old, he stayed after practice to cut weight. Defendant told Individual D he could help him make weight. Individual D asked how defendant could help, and defendant told Individual D that a massage could take some pounds off. Defendant had Individual D lie face down on a table. Defendant

14

soon removed Individual D's pants and told Individual D to turn over on his back. Defendant then performed a sexual act on Individual D. At some point, Individual D got up, dressed, and left. This was the only time that defendant molested Individual D, and defendant and Individual D never spoke of it.

*Information Provided by Jolene Burdge*

Jolene Burdge attended Yorkville High School from 1974 to 1979. Her brother, Stephen Reinboldt, attended Yorkville High School from 1967 to 1971 and was the student-manager of the wrestling team from 1968 to 1970. Reinboldt died in 1995. According to Burdge, around 1980, she asked her brother, who was gay, about his first same-sex experience. Reinboldt told her it was with defendant while he, Reinboldt, was a high school student. Reinboldt said that defendant had abused him all through high school. Burdge was stunned. Burdge had always thought that defendant was like a father figure to Reinboldt because she and her siblings had a difficult home life. Burdge asked her brother why he never told anyone about the abuse during high school. Reinboldt said that he had no one to turn to and did not think anyone would believe him.[4]

---

[4]     A high school friend of Reinboldt told agents that Reinboldt told him in 1973 that he had a sexual experience with defendant during high school. The friend recalls Jolene Burdge telling people at her brother's funeral that defendant had molested her brother. After defendant was indicted, a second high school friend of Reinboldt contacted the first friend and told him that Reinboldt had told him that defendant had molested Reinboldt throughout high school while Reinboldt was between 14 and 17 years old. In addition, in 2006, a friend of Burdge executed an affidavit confirming that Reinboldt told him in 1980 that his first same-sex experience was with defendant while Reinboldt was in high school.

15

After Reinboldt passed away, defendant attended Reinboldt's wake. Burdge followed defendant to the parking lot when he left and told him that she knew what defendant had done to her brother during high school. Defendant just stared at her and gave no verbal response before walking away.

*Information Provided by Individual C*

Individual C was a wrestler at Yorkville High School. One day after wrestling practice, Individual C stayed late to run in order to cut weight. After Individual C finished showering, defendant asked him if he wanted a massage. Individual C agreed. Individual C did not think it was strange at first because it was not unusual for defendant to treat injuries. Defendant told Individual C, who was wearing only a towel, to get up on a table. At some point, defendant told Individual C to turn over onto his back. Individual C's towel came off and his genitals were exposed. Defendant brushed his hand against Individual C's genitals, though Individual C does not know if it was on purpose. Individual C recalls that it was "very weird" and made him uncomfortable. Individual C did not physically react to being touched by defendant, and at some point he got up and put on his clothes.

*The Conclusions Drawn from the Investigation and Victim Interviews*

Defendant knew that if his molestation of Individual A became public, it would increase the chance that other former students he molested would tell their stories. Defendant also knew from his interactions with Jolene Burdge at her brother's funeral years earlier that she had been deeply affected by what defendant did to her

16

brother, and she was likely to tell her story publicly if anyone would listen. It was against this backdrop that, once confronted by Individual A, defendant spent years violating banking laws of which he was fully aware in order to keep secret his sexual abuse of wrestling team members.

During the December 8, 2014 interview with agents at his home, defendant denied that he was in any sort of trouble and told agents he was simply "keeping the money." These statements, as it turned out, were false. Defendant lied to the agents to conceal what the government later learned was the true reason he structured the withdrawals, which was to quietly compensate one of his sexual abuse victims.

The government did not immediately charge defendant after the December 8, 2014 interview—even though his explanation that he was keeping the money in a safe place did not make much sense. The government continued to investigate after defendant's counsel and defendant told the government that defendant was being extorted by Individual A. As set forth above, the government soon determined that the extortion claims were untrue.

### B.     History and Characteristics of the Defendant

In October 1979, in the midst of high school wrestling season, defendant chose to pursue a public life in politics. Defendant's sexual abuse of boys on his team occurred before this decision and was still occurring at the time defendant chose to enter public life. Defendant was not just a teacher and coach. Defendant was famous in Yorkville as the beloved coach of the state champion wrestling team; the leader of

17

a boys' club that took trips to the Grand Canyon and the Bahamas; and the popular teacher who gave kids rides in his Porsche. David Bernstein, *Small Town, Big Secret?*, CHICAGO MAGAZINE (Sept. 2015). Defendant was so sure his secrets were safe that he apparently had no fears about entering a profession where one is subject to constant scrutiny and media attention. As Stephen Reinboldt told his sister when she asked him why he never told anyone what defendant did to him during high school, "Who is ever going to believe me?" Julie Bosman and Dave Philipps, *Woman Says Hastert Abused Her Brother in High School*, N.Y. TIMES, June 5, 2015.

Defendant's history and characteristics are marred by stunning hypocrisy. When reflecting on his days coaching high school wrestling, defendant wrote, "There's never sufficient reason to try to strip away another person's dignity." Denny Hastert, *Speaker: Lessons from Forty Years in Coaching and Politics* 26 (2004). Yet that is exactly what defendant did to his victims. He made them feel alone, ashamed, guilty and devoid of dignity. While defendant achieved great success, reaping all the benefits that went with it, these boys struggled, and all are still struggling now with what defendant did to them. Some have managed better than others, but all of them carry the scars defendant inflicted upon them. The incidents of sexual abuse occurred at a time in their lives when they stood on the beginning edge of sexual maturity. It is profoundly sad that one of their earliest sexual experiences was in the form of abuse by a man whom they trusted and whom they revered as a mentor and coach. Defendant's legacy of sexual abuse and its real consequences are as much a part of

18

defendant's history and characteristics as those he has presented to the Court in his Sentencing Memorandum.

Defendant, in his Sentencing Memorandum, expressed deep regret and remorse for his actions decades ago and the harm he caused to others. But earlier, in his Defendant's Version, though defendant did not dispute the facts of Individual A's account, he suggested ambiguity about whether those facts constitute sexual misconduct. Defendant used his position of trust as a teacher and coach to touch a child's genitals and then undress and ask the child for a back massage in a motel room. There is no ambiguity; defendant sexually abused Individual A.

Further, in his Defendant's Version, defendant denies sexually abusing Stephen Reinboldt. Prior to his death, Reinboldt told his sister and others close to him, as early as 1973, about defendant's abuse—well before defendant abused some of the other known victims and years before any of those victims recounted the abuse. Defendant's denial, in order to be true, means that Reinboldt would have had to lie about himself yet successfully predict what defendant would do in the future to other students. This cannot be. Reinboldt was a victim and defendant was his abuser. Defendant has denied the truth about a victim who no longer can step forward and speak for himself. The Court may properly consider defendant's unwillingness to accept aspects of his past misconduct when weighing defendant's personal history and characteristics under Section 3553.

**C.     Need for Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Afford Adequate Deterrence and Provide Just Punishment**

Defendant's conduct is serious by any measure. The structuring laws are in place for a good reason: they help law enforcement ferret out serious criminal activity that could otherwise go undetected. That underlying criminal activity may include, as here, sexual abuse of minors. When considering the seriousness of the offense it is impossible to separate the "technical" crime of structuring from its surrounding conduct, which includes defendant's motive for engaging in the structuring crime (concealing his sexual abuse of minors). The sentence should reflect that seriousness and provide appropriate punishment.

With regard for the need for the sentence to promote respect for the law, there are two distinct considerations in this case. First, the sentence must reflect the seriousness of the offense and promote general deterrence. A meaningful sentence for structuring that is committed to conceal other criminal activity provides deterrence not only of future structuring offenses, but also of the use of structuring to conceal other crimes. Because this case has received substantial media attention, there is a meaningful opportunity for the sentence to promote respect for the law and to deter others from similar crimes. And the sentence should send the message that all are equal before the law—specifically—that a wealthy and powerful person who held high office is subject to the same sanctions as an ordinary citizen.

20

The government does not believe that the need for specific deterrence is a significant factor in this case. However, as set forth below, the government agrees with the Probation Officer that certain supervised release conditions should be imposed in this case.

### D. Response to Certain Arguments in Mitigation

The government acknowledges that defendant has serious health conditions and the government has no reason to dispute the defendant's current state of ill health. The defendant's physical condition constitutes mitigation that the Court should consider along with the aggravating factors. It is worth noting, however, that if the Court imposes a term of imprisonment, the Bureau of Prisons is capable of housing defendant in a medical facility where he could be seen by outside specialists and receive necessary medications. PSR at 113.

Defendant also cites his record of public service and the letters of support he has received as reasons for leniency. The government does not take issue with defendant's public service, nor does it doubt the sincerity of defendant's supporters. Defendant's public service and support from his family and some in the community are positive aspects of defendant's character that the Court should consider. The difficulty remains, however, for the Court to balance the positive nature of defendant's public service with the need to avoid a public perception that the powerful are treated differently than ordinary citizens when facing sentencing for a serious crime. Similarly, the Court must balance the defendant's public service and

21

the sincerity of defendant's supporters who wrote letters on his behalf against the fact that defendant enjoyed opportunities and the support of others through the years by keeping secret his sexual abuse of children, including by committing the crime for which he is being sentenced.

## III. Response to Allegations Regarding Government's Release of Information

In the Defendant's Version, defendant references two apparent unauthorized disclosures of information to the press, one shortly before indictment and one at the time of indictment. To be clear, any government official who had knowledge of this case, whether before or after indictment, should not have released non-public information about the case to the press. Such leaks should never occur. In each instance, the United States Attorney's Office immediately took appropriate measures consistent with Department of Justice policies and procedures.

Unfortunately, the apparent leaks caused the existence of the investigation to be discussed publicly before charges were filed, placed the defendant in a spotlight of allegations not expressed in the indictment once issued, and blindsided a victim who had not otherwise been referenced in the charges. The information about Individual A's sexual abuse and the existence of other victims would have eventually come out through the normal process of the case and, therefore, the apparent leaks are not mitigation of defendant's sentence. They are, though, destructive of the criminal justice process itself.

Up to now, the government has limited its presentation of information to protect the victims and to avoid prejudicing the potential jury pool through explicit reference to molestation crimes that were not (and could not) be charged in this case. Now, however, defendant has pled guilty and there is no risk of pretrial jury prejudice. Further, there is a clear need now, in light of the Court's required consideration of the Section 3553 factors, for full information to be known publicly about all aspects of defendant's conduct relating to the structuring activity, of which the sexual abuse is a core component. Lastly, the victims are in a position now that, while most still want to maintain personal anonymity, they understand that the details of what happened to them are an important and necessary part of the sentencing considerations in this case.

## IV. Proposed Conditions of Supervised Release

The United States recommends that the Court impose the conditions of supervised release set forth below.

### A. Mandatory Conditions of Supervised Release

The following conditions are required by 18 U.S.C. § 3583(d):

1. Defendant shall not commit another Federal, State or local crime (1).

2. Defendant shall not unlawfully possess a controlled substance (2).[5]

---

[5] The government agrees with the Probation Officer that the Court waive mandatory condition 6 (drug testing) because defendant does not have a history of substance abuse. This mandatory condition "may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable information indicates a low risk of future substance abuse by the defendant." 18 U.S.C. § 3563(a)(5).

3.     Defendant shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law (5).

**B.     Discretionary Conditions of Supervised Release**

The following conditions would facilitate supervision by the probation officer, encourage compliance with the law and deter the defendant from future crimes, and may be imposed pursuant to 18 U.S.C. §§ 3563(b) and 3583(d):

1.     Defendant shall not knowingly meet or communicate with Individuals A, B, C and D without preapproval from a probation officer (6).

2.     Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon (8).

3.     Defendant shall remain within the jurisdiction where he is being supervised (with a map being provided to the defendant by the probation officer at the inception of the supervised release period), unless granted permission to leave by the court or a probation officer (14).

4.     Defendant shall report to a probation officer as directed by the court or a probation officer (15).

5.     Defendant shall permit a probation officer to visit him at home at any reasonable time and shall permit confiscation of any contraband observed in plain view of the probation officer (16).

6.     Defendant shall notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries from a probation officer (17).

7.     Defendant shall notify a probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer (18).

### C.     Special Conditions of Supervised Release

The following conditions would deter the defendant from future crimes, protect the public, and provide the defendant with needed treatment, and may be imposed pursuant to 18 U.S.C. §§ 3563(b)(22) and 3583(d). These conditions are necessary in light of defendant's history of sexual misconduct (PSR at 7; PSR Supp. 1; PSR Supp. 3).

1.     Defendant shall participate in a sex offender evaluation. The specific evaluation and provider will be determined by a probation officer. Defendant shall comply with all recommended treatment, which may include psychological and physiological testing, as a result of the evaluation. (9).

2.     If the probation officer determines that defendant poses a risk to another person, the probation officer shall notify the Court and provide a recommendation for further action. (13).

## V.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant within the applicable Guidelines range as determined by the Court and impose the conditions of supervised release recommended by the government.

April 8, 2016                                    Respectfully submitted,

                                                 By:   /s/ Steven A. Block

                                                 ZACHARY T. FARDON
                                                 United States Attorney

                                                 Steven A. Block
                                                 Diane MacArthur
                                                 Assistant U.S. Attorneys
                                                 219 South Dearborn St.
                                                 Chicago, Illinois 60604
                                                 (312) 353-5300