IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 15 CR 315 |
| | ) | |
| Plaintiff, | ) | Chicago, Illinois |
| | ) | April 27, 2016 |
| v. | ) | 10:01 a.m. |
| | ) | |
| JOHN DENNIS HASTERT, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS - Sentencing
BEFORE THE HONORABLE THOMAS M. DURKIN

APPEARANCES:

For the Government: HONORABLE ZACHARY T. FARDON
United States Attorney by
MR. STEVEN A. BLOCK
MS. DIANE MacARTHUR
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, IL 60604

For the Defendant: SIDLEY AUSTIN LLP by
MR. THOMAS C. GREEN
1501 K Street NW, Suite 600
Washington, D.C. 20005

SIDLEY AUSTIN LLP by
MR. JOHN N. GALLO
MS. GEETANJLI MALHOTRA
One S. Dearborn Street
Chicago, IL 60603

Also Present: MS. SARAH KIECKHAFER, U.S. Probation

Court Reporter: LAURA R. RENKE, CSR, RDR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 1432
Chicago, IL 60604
312.435.6053
laura_renke@ilnd.uscourts.gov

(In open court; defendant present.)

THE CLERK: All rise.

Be seated, please, and come to order.

15 CR 315, United States of America v. John Dennis Hastert.

MR. BLOCK: Good morning, your Honor. Steven Block and Diane MacArthur on behalf of the United States.

THE COURT: Good morning.

MR. GREEN: Good morning, your Honor. Tom Green and John Gallo and Geeta Malhotra on behalf of Mr. Hastert.

MR. GALLO: Good morning.

THE COURT: All right. Good morning.

MS. KIECKHAFER: Good morning, your Honor. Sarah Kieckhafer from probation.

THE COURT: Okay. Good morning all.

We're here for sentencing. Is everyone ready to proceed?

MR. GREEN: Yes, sir.

MR. BLOCK: Yes, your Honor.

THE COURT: All right. I have received the following documents. I want to make sure I have everything that I should have.

I've received the presentence report and a supplement to it and the recommendation of the probation officer. These are Documents 63, 64, and 90.

I have a defendant's sentencing memorandum, the defendant's response to the presentence report and sentencing recommendation.

The government's sentencing memorandum.

A large number of letters in mitigation for the defendant and a large number of letters in aggravation against the defendant, some of which I received as early as this morning. Every letter, e-mail, and voice mail I've received I've made part of the public record. The voice mails I've had transcribed and put in the public record. The e-mails and letters have all been posted.

Earlier letters filed by the defense that were not part of the public record I did not consider unless you later filed them publicly. And you filed a number of them publicly, and I've considered all of them.

I have also received a letter from the defendant's physician, Dr. Kevin Egly of Sandwich, Illinois, and a letter from the court-appointed expert, Dr. Robert Golden of Northwestern.

I've also received a letter from Dr. Paul Harvey, the regional medical director of the Bureau of Prisons.

And in the last few days, I received a submission from the defense relating to health issues of the defendant, which attaches a letter from Mr. Phillip Wise, a consultant who specializes in Bureau of Prisons health care issues.

The doctor letters and Mr. Wise's letter are not part of the public record, but they address -- because they address confidential medical information, but they have been carefully reviewed by me. They've been given to all the parties, and the parties are free to discuss any parts of the letters they want during these proceedings.

Are there any other documents the parties believe I should have before continuing with the sentencing? First the government.

MR. BLOCK: Not from the government, your Honor.

THE COURT: Defense.

MR. GREEN: None that we know of, your Honor.

THE COURT: All right. I will state for the record the presentence report was well written, thorough, and reflected the level of excellence I've observed from the Chicago probation office in my three and a half years on the bench. So I compliment Ms. Kieckhafer on the report.

I'd also like to thank the attorneys for the government, Mr. Block and Ms. MacArthur, and the attorneys for the defendant, Mr. Green, Mr. Gallo, and Ms. Malhotra. The written submissions from both sides have been excellent and provide me with the important information I need to render a decision, along with anything I learn today.

So the United States through the Assistant U.S. Attorneys and the defendant through his attorneys have

been well served by their conduct.
All right. Has the -- have you received a copy of the presentence report and discussed it with your client?
MR. GREEN: We have, your Honor.
THE COURT: I'd like an acknowledgment from the defendant himself that he has read and reviewed the presentence report. He doesn't need to stand. Just make sure the microphone is in front of him.
But I would like the defendant to acknowledge he, in fact, has read the presentence report and discussed it with his attorneys.
THE DEFENDANT: Yes, I have.
THE COURT: All right.
The first question is, are there any objections to the presentence report? I'll get into guideline calculations in a minute. But are there any objections to the factual recitations in the presentence report or the supplement to it?
MR. GREEN: There are no objections other than what we have noted in our submission, your Honor.
THE COURT: All right. There was one objection to something that was contained in the recommendation relating to the possibility of other victims. I won't consider speculative evidence. But it is not a correction to the presentence report itself. So I will note for the record your objection to that, but it's not part of the presentence report itself.

MR. GREEN: Yes, sir.

THE COURT: All right. As to the guideline calculations, the parties all agree, as do I, that the criteria of Section 2S1.3(b)(3) have been met. The proceeds were not unlawfully obtained and were used for a lawful purpose, so the so-called safe harbor provision of the advisory sentencing guidelines applies to make the base offense level 6.

The probation officer recommended that two points be added for obstruction under Section 3C1.1, something the defense objects to because any obstructive conduct did not relate to the count of actual conviction.

The case law supports the defense on this, and the government agrees with the calculation through the plea agreement. Having looked at the case law, I believe the defense is technically correct as far as guideline calculations are concerned.

The probation officer makes a number of compelling arguments why the defendant engaged in obstructive conduct, and I'll consider those arguments and that conduct as part of the factors under 18 U.S.C. 3553(a) that I must consider, but the points won't be added to the base offense level for the advisory guideline calculation.

The defendant has pled guilty to the crime of structuring, so he receives acceptance of responsibility points -- credit, two points -- for admitting to the crime of

conviction.

That leaves an adjusted offense level of 4, with a criminal history category of I, and that leads to an advisory guideline range of zero to six months' incarceration.

Do the parties have any objection to those findings? First, the government.

MR. BLOCK: Not from the government, your Honor.

THE COURT: And the defense.

MR. GREEN: No, sir.

THE COURT: All right. I'll note that even if I had added the two points for obstruction that was recommended by probation and did not give acceptance of responsibility points to the defendant, it would lead to an adjusted offense level of 8 and still an advisory guideline range of zero to six months' incarceration.

Now, I would like to ask first the government. Are you expecting any -- to call any witnesses or any type of evidentiary hearing?

MR. BLOCK: Yes, your Honor. There are two witnesses that we would ask to have address the Court.

THE COURT: All right. And who are they?

MR. BLOCK: The first is Jolene Burdge, and the second is Individual D. And I'd like him to introduce himself to the Court.

THE COURT: All right. But he will be testifying and

providing his full name when he testifies.

MR. BLOCK: Yes, your Honor.

THE COURT: All right.

And is the defense expecting to call any witnesses?

MR. GREEN: No, sir.

THE COURT: All right.

All right. Well, I will make a finding then that the advisory guideline range is, as I just stated, zero to six months and that there be an adjusted offense level of 4.

Are there any formal motions for departures? Not variances, but departures. First from the government.

MR. BLOCK: Not from the government.

THE COURT: And from the defense.

MR. GREEN: No, sir.

THE COURT: All right. After calculating the guidelines and finding no departures are appropriate, I must now consider the relevant factors set out by Congress in 18 U.S.C. 3553(a) and ensure that I impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.

These purposes include the need for the sentence to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense. The sentence should also deter criminal conduct, protect the public from future crime by the defendant, and promote rehabilitation.

In addition to the guidelines and policy statements, I must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentence disparities among similarly situated defendants, and, finally, the types of sentences available.

Before I ask the government to argue about the application of such factors and request a variance or otherwise make a sentencing recommendation, I think it's appropriate you call your witnesses.

Attorneys can all be seated if they wish.

Please call your first witness.

MR. BLOCK: Thank you, your Honor.

And we would -- the witnesses will be reading statements, not providing testimony through the form of questions, so I'd ask they be able to address the Court from the podium.

THE COURT: They may, but they're going to be sworn in.

MR. BLOCK: Yes, your Honor.

THE COURT: All right. Please call your first witness.

MR. BLOCK: Jolene Burdge, please step up.

THE COURT: And if the defense decides they want to ask questions of any of these witnesses, you're free to do so, but the witness will take the stand rather than you asking

questions next to them.

MR. GREEN: Understand, your Honor.

THE COURT: All right.

THE CLERK: Raise your right hand, please.

(Witness duly sworn.)

MS. BURDGE: I do.

THE COURT: You may proceed.

MS. BURDGE: My name is Jolene Burdge, and I am the sister of Stephen Reinboldt.

"Dear Mom: It rained this morning, but now the sun is out and the air is crisp and clean. I've been on a shopping spree these past couple of days, so now I have to kick back to the first of the month.

"I got a new pair of sneakers and replaced my lawn chair rocker, both on sale, and got the new Bruce Springsteen and Annie Lennox albums, so I'm happy but broke.

"Usually I'm in the backyard trying to get some sun, rocking in the rocking chair. On Friday I go to the oncology department so they can check out my KS sores, but I don't think there is a lot they can do for me.

"The taxi comes to pick me up and takes me back home, so I don't have to worry about driving. Other than that, it's steady as she goes."

Steve died five months after writing this letter. He was 42 years old. His last years were spent alone in a

one-room apartment, barely able to support himself, waiting to die.

The sight in his right eye was gone. Neuropathy made it hard to walk, and the people shunned him when they saw his KS lesions. He had long given up trusting people and found solace in his music and movies.

He spent most of his life jumping from job to job or having no job at all.

His letters were full of false hope that next week or next month or next year would be better. If Mom could just send him a little money to get him through the month, he knew his break was coming.

He used to send me VHS tapes full of his favorite movies, along with commentary notes explaining the special effects, history of the director, new techniques in lighting and sound, letters full of passion for the arts and film he dearly loved, dreams and goals he would never fulfill.

I held Steve's hand the night he died. Fear of the AIDS epidemic was at its height in 1995 Los Angeles. There was only one funeral home that would pick up his body from the hospice, and it was in the cover of night.

After six years of helping him bear yet another secret, his burdens were finally lifted. Mine got heavier, and that's when it all changed: No more secrets. No more guilt or shame for the choices we had to make in order to survive.

If ever given the chance, I would confront you face to face and make you accountable for sexually molesting my brother. 20 years ago you treated me like an insignificant annoyance, but I knew your secret and you couldn't bribe or intimidate your way out.

Now I stand here 20 years later with the truth on my side. I hope I have been your worst nightmare.

Like many, Steve thought you were a wonderful teacher, committed to upholding the educators' code of ethics to help each student realize his or her potential as a worthy and effective member of society, to protect the students from conditions harmful to learning or to their health and safety, a generous man who wanted to be a friend and mentor, helping kids get through their teenage years.

And our family had very tough years. Emotional and physical abuse, neglect, alcoholism, and mental illness leave a kid looking for refuge. That's exactly what you gave him. You showed interest in his life and encouraged him to participate in activities; someone really cared. But your words and actions were soon used as weapons to get what you wanted all along.

You took Steve's right to discover and develop his sexual identity in a normal, healthy way. His diminishing self-worth left him vulnerable to your ongoing manipulation. His social worker once commented that you made it impossible

for Steve to see the situation clearly.

Telling Steve's story without the sexual abuse is like telling the story of the Titanic without the ship. You think you can deny your abuse of Steve because he can no longer speak for himself. That's why I'm here.

You claim to be deeply sorry and remorseful for what you did years ago. You claim to understand the gravity of your misconduct and are prepared to accept responsibility for your actions. How can that be when you refuse to acknowledge the true reason behind the money structuring and lying to the FBI?

Don't be a coward, Mr. Hastert. Tell the truth. What you did wasn't misconduct; it was sexual abuse of a minor. Call it what it is. Show us that honesty, integrity, and decency that you and all your supporters claim you live by.

I don't remember the last Christmas or birthday I spent with Steve. While you were enjoying holidays and time with your family, we were wondering where Steve was or if he was even alive. If he had died, how would we ever find him?

I miss him so much. No one ever made me brag louder or laugh harder no matter how awful things were at home. After he died, it was hard to breathe.

Your family members have expressed concern about how much time they might have left with you based on your current health conditions.

From Steve's high school graduation in 1971 until his

death 24 years later in 1995, I estimate I had one year with Steve. The rest of those years he spent running from the pain and turmoil of lifelong trauma and the knowledge that no one would believe you were his abuser. He felt betrayed, ashamed, and embarrassed.

When a man is sexually assaulted, it means they weren't strong enough to fight back: It must have been his fault. He wasn't strong enough. You were supposed to keep him safe, not violate him. Obviously, he couldn't trust his own judgment of a person's character.

You are pleading for people to remember all the wonderful things you have done for individuals and the Yorkville community. Family and supporters praise you as a father and friend. One even suggests we should minimize your slight flaw of being a child molester.

That is impossible and morally wrong, just as it was impossible for Steve to minimize the extent of your mental and emotional abuse. You took his life, Mr. Hastert, not because he died of AIDS, but because you took his innocence and turned it against him. He was too young and vulnerable to understand that. It led him down a path of high-risk, reckless behavior, which ultimately cost him his life.

I'm fairly certain your supporters would feel differently if this had been their brother, sister, son, or daughter.

I will always wonder if you are truly sorry for what you did or just sorry you got caught.

"Dear Mrs. Reinboldt: I don't think I have ever met you, but I did have the pleasure of knowing Steve. I worked with Steve one summer at the Yorkville Tastee-Freez. My parents thought it would be great for me to work there and stay with my grandma who lived close by. It wasn't so easy for me, though, because I was a nobody from another town, not popular or a cheerleader like most of the other girls.

"Steve's friendliness, kindness, and sense of humor kept me coming back to work each day and enjoying it. He was very special. He probably has no idea what his kindness meant to me. I am truly sorry for your loss."

This was Steve's character. His care and love for people was real and unsolicited.

Today is a tribute to Steve for all he endured and all he held inside his entire life. I know he stands here with me today, free and at peace. I will accept and respect whatever decision this Court makes today. Our victory is knowing that this man is finally being brought to justice and will live in his own prison for the rest of his life.

Thank you.

THE COURT: Thank you, Ms. Burdge.

Government may call its next witness.

MR. BLOCK: Thank you, your Honor.

THE COURT: Mr. Green, did you have questions, by the way, of Ms. Burdge?

MR. GREEN: No, sir.

THE COURT: All right. Thank you.

THE CLERK: If you could raise your right hand, please.

(Witness duly sworn.)

MR. CROSS: I do.

Good morning. Thank you very much, Judge Durkin, for this opportunity to speak to you today and to discuss how Mr. Hastert has affected my life.

My name is Scott Cross. I'm 53 years old. I live in the Chicago area with my wife and my two children. I've worked in the financial services community for over 30 years, since graduating from college in 1984.

In 1972, when I was ten years old, my family moved from the south side of Chicago to Yorkville, Illinois. My father was a Methodist minister, and we moved often. But we spent the next nine years in Yorkville, and I consider Yorkville to be my childhood home.

A few years after we moved to Yorkville, when I was about 13 years old, Coach Hastert's high school wrestling team won the Illinois state championship. For a small town like Yorkville, this was a very significant event. Coach Hastert was revered in Yorkville, and after the state championship,

there was even a parade throughout the town, celebrating him and the team.

As a young boy, I wanted to be part of what Coach Hastert had created. I was a small guy with a lot of ambition, and wrestling seemed to be the perfect sport for me. I jumped in with both feet, and wrestling became very important to me. My perception of myself as a wrestler dominated my high school experience.

I was selected by Coach Hastert to join him at wrestling camps in Virginia and Colorado, including wrestling camps that were held even before I entered high school. As a freshman, I was chosen to wrestle at the varsity level in one match. This was one of my proudest moments in high school.

As a senior, I was named captain of the wrestling team. I was good enough and lucky enough to wrestle in high school state championship tournaments as a junior and a senior.

As a high school wrestler, I looked up to Coach Hastert. He was a key figure in my life as a coach and a teacher. In a small town where the high school and high school athletics were extremely important, I respected and trusted Coach Hastert.

Forgive me.

THE COURT: Take your time.

MR. CROSS: Coach Hastert sexually abused me my senior year of high school.

In fall 1979, my senior year, I stayed late after practice. Our school had built a separate wrestling room with a separate locker room for wrestlers. I was alone with Coach Hastert in that locker room. I was concerned about making weight for a match scheduled to occur the following day.

Coach Hastert told me he could help me lose weight by giving me a massage. Because I trusted him, I believed what he was saying and took him at his word. He told me to get down on the training table in the wrestlers' locker room and lay facedown with my shirt off. He began giving me a massage.

After a few minutes, Coach Hastert told me to roll over onto my back. He pulled down my shorts, grasped my penis, and began to rub me. I was stunned by what he was doing. I jumped up, pulled up my shorts, and ran out of the locker room.

I did not say anything to anyone. I did not talk about it, what Coach Hastert had done to me, with my parents, my brothers, other coaches, or school officials. Coach Hastert and I never spoke of it.

As a 17-year-old boy, I was devastated. I tried to figure out why Coach Hastert had singled me out. I felt very alone and tremendously embarrassed. I felt intense pain, shame, and guilt. Today I understand that I did nothing to bring this on, but at age 17, I could not understand what happened or why.

As I reflected on this after leaving high school, I

realized there was other troubling behavior from Coach Hastert that I did not appreciate at the time. Coach Hastert kept a recliner positioned in the wrestlers' locker room where he would sit and watch the wrestlers in the shower. I had accepted this because I trusted him, and my teammates appeared to as well.

I've always felt that what Coach Hastert had done to me was my darkest secret, particularly as Coach Hastert became more famous as a politician and Illinois state legislator and then in Congress and finally as Speaker of the House.

After this prosecution became public, I told my older brother and my wife for the first time what had happened. I shared this with my parents for the first time last year when I realized that I needed their support as this prosecution proceeded in the public spotlight.

I sought professional help to get me through the pain and the trauma that has suffered -- surfaced since the prosecution began. I've had trouble sleeping and working. This entire experience has been enormously painful for me and my family.

Given these challenges, you might be asking me why I came forward today. This decision to appear before you in this very public setting has been a huge personal struggle. In fact, until I actually got up to this podium, I was not even sure I would be able to bring myself to speak to you in this

courtroom.

I'm only able to do this now because I wanted you to know and understand how Mr. Hastert violated the trust I placed in him as a high school student. Judge Durkin, I wanted you to know the pain and suffering he caused me then and still causes me today.

As importantly, I want my children and anyone else who was ever treated the way I was to know that there's an alternative to staying silent. As deeply painful as it has been to discuss this with my family and with you, staying silent for years was worse. It is important to tell the truth finally about what this -- what happened to me. I could no longer remain silent.

Thank you for listening to me.

THE COURT: Thank you, Mr. Cross.

Are there any questions, Mr. Green?

MR. GREEN: No, sir.

THE COURT: All right. Thank you, sir.

MR. CROSS: Thank you.

THE COURT: All right. I'll ask the government now if they wish to argue about the application of the factors set forth in 3553(a), request a variance, or otherwise make a sentencing recommendation.

MR. BLOCK: We would, your Honor.

THE COURT: All right. You may proceed, Mr. Block.

MR. BLOCK: Thank you, Judge.

Your Honor, the government began this investigation with no preconceived notions of where the evidence would lead. The investigation focused on what we thought was recent conduct, defendant's financial transactions between 2010 and 2014.

We certainly did not know we would end up in a courtroom like this, hearing from a former student who defendant sexually abused and the sister of another one of defendant's victims. We didn't expect to be here hearing them describe the anguish the defendant put them through.

The investigation instead focused almost exclusively on answering a key question: What was defendant doing with the money and why?

There could have been answers to that question that would not have resulted in prosecution. But when defendant's motive became clear, which was to cover up the sexual abuse of children, there were no doubts that prosecution was warranted.

The statute of limitations did not allow the defendant to be held directly accountable for these crimes, but the defendant through this prosecution has been held accountable for his recent crimes that he committed and his reason for committing them: defendant's illegal structuring of financial transactions to cover up his past abuse.

And to be clear, had there been an opportunity for the

government to charge the defendant with sexually abusing boys in his care, we would have. Had there been opportunity to refer this matter to the state for prosecution of those crimes, we would have.

But because we were unable to do that, the sentence the defendant receives, whatever the Court decides today, may not bring the amount of punishment that many think the defendant deserves. The justice in this case comes from the sentence the Court imposes and -- and it comes from the fact that defendant's crimes, all of them, are known and he has been held accountable for them.

Had we been able to charge the defendant with sexual abuse crimes, the advisory guideline range would have been substantially higher. The guidelines in this case, however, are driven entirely by the offense of conviction, structuring financial transactions.

The guidelines do not take into account the defendant's crimes against children. And to many, a sentencing range of zero to six months' imprisonment when the financial crime was motivated by the desire to hide such horrible crimes against children may be illogical and distasteful. But the law is clear that the guidelines applicable in this case cannot be increased based on that conduct.

We are recommending a sentence within the guidelines range determined by the Court. In making this decision and

agreeing not to comment further regarding where within that range an appropriate sentence falls, the government examined the facts we knew at the time the plea was negotiated. And as we do in all cases, we analyze the risks if the case proceeded to trial.

But in this case in particular, because it involved sexual abuse victims, the government paid close attention -- close attention to the wishes of one of the victims known at the time, Individual A. Individual A would have had to testify if this case proceeded to trial. And Individual A clearly stated that he wanted to protect his anonymity and only publicly testify if there was absolutely no other choice.

Trying to respect his decision was a driving force for us in negotiating the plea and agreeing to the sentencing recommendation.

If it was at all possible to get to this day of accountability without needing to put Individual A through a trial, we wanted to honor his clearly stated wish, and we have been able to do that.

Now, regardless of the guidelines range, the Court is certainly permitted to consider defendant's crimes against children in fashioning an appropriate sentence under Section 3553.

And in considering the defendant's history and characteristics, there is no doubt the defendant's conduct

while a teacher and coach was horrendous, and there's no way for me to say it any better than what you just heard from Jolene Burdge and Scott Cross.

As horrendous as that conduct was decades ago, so was his conduct just last year.

After being approached by the government and asked to explain the large cash withdrawals, the defendant had choices. He could have refused to talk to the government. He could have talked to the government, admitted he had wronged Individual A, and acknowledged he was paying compensation. Though it would have been illegal in its own right, he could have lied and made up a benign explanation for the cash withdrawals.

He did none of those things. Instead, the defendant chose the worst possible course in order to keep his dark secret of abusing boys quiet.

The defendant agreed to record conversations with Individual A after unequivocally telling the government that Individual A's accusations were baseless. And defendant knew what he was doing. If Individual A was demanding compensation for an incident that had not occurred, then the demand was wrongful and Individual A was committing extortion.

Defendant knew the reason the government sought to record those conversations. He's not an unsophisticated person. The defendant knew that when federal agents and prosecutors asked him to record those conversations, it was to

gather evidence to build a criminal case against Individual A.

And the defendant knew then, as he has now acknowledged, that Individual A's accusations were not baseless; in fact, they were true. Defendant knew that he was trying to build a criminal case against Individual A, even though Individual A had committed no crime.

Defendant knew that he had, in fact, abused Individual A and several other students, and his decision last year was designed to keep his dark secrets hidden by victimizing Individual A all over again.

To this day, your Honor, the defendant's efforts to conceal aspects of his dark past continue. Though he has acknowledged through his guilty plea that he committed past misconduct and lied to the FBI, he continues to deny what should now be obvious to everyone: Defendant sexually abused Stephen Reinboldt while Reinboldt was a high school student.

The sentence the Court imposes should take into account all of the harm defendant has caused, both long ago and recent, and the profound harm that he still refuses to acknowledge.

Now, though the sentence the Court ultimately imposes is important, the defendant's punishment should not and will not be the only lasting effect of this prosecution or this proceeding.

Defendant's attempt to quietly compensate Individual A

by structuring his withdrawals and his attempt last year to frame Individual A show just how desperately defendant wanted to keep his dark secrets. But he has failed.

This process has shined a light on defendant's history of sexual abuse and his efforts to cover it up. Due to the courage and candid statements of Individual A, Individual B, Individual C, Scott Cross, and Jolene Burdge on her brother's behalf, defendant has been exposed for who he is, and the record can finally be set straight.

The light shined on defendant's history of sexual abuse sends a strong message to defendant's victims that has been missing for far too long. Each victim we talked to said something almost identical: "In light of the defendant's position, who is going to believe me? Who would believe me?"

Through this process, it should be clear to the victims we do believe you. You do not stand alone. What happened to you long ago is now understood and acknowledged by all. And hopefully victims of others who are afraid to come forward will also see they too will be believed no matter how prominent the abuser.

Finally, this proceeding should send a strong message to other perpetrators like the defendant. Defendant has not gotten away with it, either through the passage of time or his prominent position. Others' dark secrets will similarly not be safe. They will be pursued and exposed even if it takes

decades and even if we have to use all the lawful tools at our disposal.

Your Honor, the defendant has said that today would be the most difficult day of his life, and that is probably true. But for defendant's victims, some of whom you've heard from, their most difficult day was in a motel room or a locker room decades ago. And they have had to relive that most difficult day over and over and over again in the years that followed.

The defendant has argued that the shame of being exposed is punishment enough. Being exposed may be shameful, but it is not accountability. The fact that defendant is being sentenced today and the truth has been told both about the uncharged abuse from years ago and the charged crimes that involve covering up that abuse will provide defendant's victims with some measure of justice.

We ask that this Court, through the sentence imposed, take all aspects of defendant's history into consideration and that he be held accountable for all of the crimes that he committed.

Thank you, your Honor.

THE COURT: All right. Thank you, Mr. Block.

Does the defense wish to argue about the application of the factors set forth in Section 3553(a), request a variance, or otherwise make a sentencing recommendation?

MR. GREEN: Yes, your Honor.

THE COURT: All right. Mr. Green, you may proceed.

MR. GREEN: May it please your Honor, I am hopeful that my words will be adequate this morning to convey my thoughts as you consider my client's sentence.

Let me, sir, say right at the outset to Mr. Cross and to Ms. Burdge and to the others that nothing I say this morning as I advocate on behalf of Mr. Hastert should be interpreted or received by anyone as an attempt to minimize the emotional trauma and lasting injury experienced by any of the individuals who were abused by Mr. Hastert over 30 years ago. We acknowledge and respect what we have heard here this morning.

In a few moments, your Honor, Mr. Hastert will stand before you, convicted by his own admission of one count of structuring withdrawals of cash from a bank. There is no dispute over the fact that all of the money that Mr. Hastert withdrew belonged to him and was lawfully earned.

And, sir, as we cited in our submission as part of the presentence report, rarely, if ever, has there been a sentence of confinement for this kind of structuring. Having said that, I am well aware that there are other factors that will influence your sentencing decision. And I am not here attempting to minimize the instances of misconduct that occurred many years ago.

But it is also indisputable that thereafter, Dennis Hastert was able to reshape his life into a career of public

service and extraordinary accomplishment.

So what I am asking, your Honor, is that you take into consideration the entire arc of Mr. Hastert's life, which at this point not only embraces the past, but also Mr. Hastert's prospects for the future.

The government has asked, I think, in one of its submissions that you not show Mr. Hastert particular leniency because of who he is or who he was. I trust that you know, sir, that I am not advocating for that, and Mr. Hastert is not expecting that.

What I am asking, however, is that my client not suffer a more severe punishment for the same reason. Whatever sentence your Honor imposes, it must, as I believe it will, take into account those factors germane to this process.

When approximately six years ago a former student of Mr. Hastert returned to confront him about abuse, my client was severely frightened and disoriented. His instincts were to try to prevent the unraveling of his entire life, and in the grip of these emotions, he made some very poor decisions.

I wish he had called for help on that day, but he didn't.

I do not have the words to describe the anxiety and the burdens that Mr. Hastert must have carried during the next few years, but all of that must have become almost incapacitating when FBI agents arrived at his home early in the

morning of December 8th of 2014 to question him.

As that investigation progressed, I'm convinced that Mr. Hastert retreated to what I might call survival instinct. And by that, sir, I mean I believe he remained emotionally incapable of reaching inward at that time to process his prior conduct and to admit the implications to himself, much less to a federal prosecutor and an agent of the FBI, sensing somehow, as I believe he did, in the recesses of his mind that he was threatened really with the destruction of both his reputation and his legacy.

I have a little different view of the proffer session because I submit that he was truthful. My client was truthful regarding the intimidation and the fear that caused him to make the payments to Individual A. But he did fail to confirm the truth of A's allegation, and his lack of candor in that regard was clearly wrong.

But the origins, your Honor, of all that are also complex. Mr. Hastert was in those moments simply unable to confront his past, and his lawyer at the time could not help him because he did not know the truth.

And some or much of that disability lingers today. A while back, we asked Mr. Hastert to give us names of individuals whom we could contact and ask for letters of support. We were given the name of Mr. Cross's older brother, Tom. And someone from my office called and talked to Tom Cross

and requested such a letter.

And I'm given to believe that that request had some impact on Scott Cross's decision to testify today, but I don't know that of my own personal knowledge.

THE COURT: I thought the first call to Tom Cross was made by the defendant. Is that incorrect?

MR. GREEN: I don't know. I thought it was from my office.

THE COURT: I'll ask the government.

MR. GREEN: It may have been from the defendant.

THE COURT: The way I read the government's supplement was the first call was made to Mr. Tom Cross by the defendant.

MR. GREEN: It may have --

THE COURT: Upon not returning the call, the second call was made from someone in your office.

MR. GREEN: It may -- it may well be, your Honor.

THE COURT: Can the government confirm that?

MR. BLOCK: That's what I understand, your Honor, from speaking with Mr. Cross.

THE COURT: All right. Go ahead, Mr. Green.

MR. GREEN: If I may, sir. But from my perspective, which is gained over talking with Dennis for almost a year, it is inconceivable to me that he would have -- he would have called, if such be the case, Tom Cross or asked us to call Tom Cross were he fully cognizant of the incident that Mr. Scott

Cross described this morning.

I don't have the medical or psychological expertise to explain that with more precision, but I do believe that aspects of Mr. Hastert's life have been compartmentalized. Maybe "walled off" is the better term.

And while none of that calls into question his competency to be sentenced here this morning, there are deficits, your Honor, which I believe have been exacerbated by his medical condition.

You told me at our last status conference -- I think I was on the phone. You allowed me, graciously, to call in -- that you considered my client's behavior with regard to the government's investigation as an aggravating circumstance.

I've tried, your Honor. I've tried to explain to the Court my client's limitations at that time and the context that surrounded the proffer session in the hope that I can persuade you to accept that what happened was not purposeful.

The arc of Mr. Hastert's life of which I speak includes many significant contributions to the welfare and security of this country throughout his many years in public office. He was by all accounts a remarkable leader who governed in a bipartisan manner and through some of this country's most difficult times.

He was asked to assume the office of Speaker shortly after the dramatic impeachment hearings involving President

Clinton when tensions in the Congress were running at an historic high.

Four years later, after four successive balanced budgets and the bipartisan passage of laws such as the funding payment for pharmaceuticals for seniors, what we know as Part D of Medicare, Congress's approval rating was at an all-time high.

As we mentioned also in our submission, your Honor, both President Bush and Mr. Hastert were instrumental in leading the response of this country to the September 11 attacks.

And he was also perhaps the single most important leader in the fight against drugs, in the Congress, coming from South America, so much so that the nation of Colombia honored him with the Cross of San Carlos medal for his work in fighting narco terrorists, and he is the only citizen of this country to have been so honored.

Nevertheless, if you were to ask Mr. Hastert to identify his proudest achievement, it would be his family, first Jean, his unbelievably supportive wife of 43 years, and his two wonderful sons, Ethan and Josh.

Understandably, Mr. Hastert wanted to spare his family the stress and emotional impact of today's proceeding, both inside and outside this courtroom. But his sons have come here this morning to demonstrate their support for their father, and

I know that Mr. Hastert appreciates that support very much. And it is his family and a very few close friends that have enabled him to endure these last 11 months.

And so I would like to take a few moments to direct some comments to this last 11 months.

Decades of not just political achievements but also acts of goodness and charity have been erased, a lot of it even physically, as his name has been removed from public places, his portrait in the Capitol sent to storage.

All of that achievement and all of these good deeds are no longer acknowledged or perhaps even remembered. They have been eclipsed by the misconduct that occurred years ago. And my saying that this morning in this courtroom cannot begin to convey the humiliation and hurt experienced by Mr. Hastert.

Many of the good and important things that Mr. Hastert did in his life were described and remarked upon in numerous letters sent to your Honor. A number of those who wrote those letters and who were strong supporters of Mr. Hastert are now reluctant to be identified publicly as his friend, and they have therefore asked their letters be withdrawn.

We are enormously grateful to those who have allowed their letters to be filed with the Court, but the withdrawal of so many letters exemplifies the growing isolation and abandonment by former friends and associates.

As your Honor knows, days following the entry of his

guilty plea, Mr. Hastert suffered a stroke, a very serious blood disease, back surgeries, and other complications that in the opinion of his physician brought him close to his demise. He has been moved back from that brink, but he is still substantially physically compromised, incapable of caring for himself, and exhibits numerous and current medical complications.

All of that has been confirmed by the examination and report of Dr. Golden, who was asked by the Court to make an independent medical assessment of my client's health.

One of Dr. Golden's principal concerns was whether the Bureau of Prisons personnel could adequately attend to all of Mr. Hastert's issues and would be able to detect signs of deterioration in his medical condition.

Dr. Harvey, a regional medical director of the Bureau of Prisons, assured Dr. Golden that all appropriate treatment is available. But I say respectfully, sir, I would have expected that response because I do not believe that the Bureau of Prisons would ever publicly concede that it is incapable of providing adequate treatment and care for anyone in the system.

The letter we submitted from Mr. Phillip Wise, formerly the assistant director for health services at the Bureau of Prisons, does raise serious issues relating to both adequacy of medical care, much of which would be provided by fellow inmates, and issues relating to Mr. Hastert's physical

safety.

Care for Mr. Hastert will also be adversely impacted in light of problems with Bureau of Prisons overcrowding and understaffing, and Mr. Wise is also concerned that Mr. Hastert will not have access to his present medications, a problem Dr. Harvey acknowledged.

There is no doubt, sir, that today Mr. Hastert is receiving the care he needs. No one knows how extensive or successful his recovery will be or the degree to which his health has been or will be permanently compromised.

But I am hopeful, your Honor, that in considering an appropriate sentence, your sentence will not increase the risks to Mr. Hastert's health and present additional risks to his physical security. And I ask you to please take all of that into consideration.

This case, sir, has been one of the most tragic and sad cases I have ever encountered. I have genuine compassion for all the victims, but I also have a great deal of compassion for Mr. Hastert, whose life will forever be compromised and diminished in every way possible.

When John and I went to visit Mr. Hastert yesterday, I found it hard to contend with the reality, sir, that he sits alone at home, confined to a wheelchair, unable to care for himself, isolated from society, with a reputation markedly different from the one he enjoyed for so many years.

I think it's important that you know that we have been discussing with Mr. Hastert the need for him to revisit this earlier part of his life so that he can begin to unravel the origins of his misconduct and understand how adversely it has impacted him and the victims.

It is my hope and Mr. Hastert's hope and God willing that he will regain the physical strength needed to begin that process.

So, sir, I ask myself, now that the arc of Dennis Hastert's life has risen and then fallen to its lowest point, can I stand here and submit to you that what has happened to him is indeed punishment. And, if so, is it enough punishment? Does justice require that more is necessary to punish for the offense of conviction? To deter? To protect the public?

In both my heart and my mind, I do not believe that more is necessary. I'm asking your Honor to conclude that confinement in a prison is neither required under the law nor necessary to show society's disapprobation. Additional punishment to that already visited is not necessary.

I ask you, sir, to sentence Mr. Hastert to a term of probation. And if you feel that more is required, I ask that any sentence be served as home confinement so that he may receive the humane care he urgently needs.

If there is to be a fine, your Honor, I ask that it be within the guideline range.

Thank you, sir.

THE COURT: Thank you, Mr. Green.

Mr. Hastert, you have an opportunity to make a statement to the Court if you wish. If you choose not to do so, I won't hold it against you, but this is your opportunity to talk to me if you wish to.

If you want to do it from your chair, you're free to do so as long as the microphone is in front of you. If you want to get up, you can come up here and do it at the podium. But I'm fine either way.

THE DEFENDANT: Thank you, your Honor.

I would ask your leave that I -- I've written down a statement, and I would like to read it.

THE COURT: Of course.

THE DEFENDANT: And I don't --

THE COURT: You may.

THE DEFENDANT: -- want to miss anything. So ...

THE COURT: Please do.

THE DEFENDANT: I'm deeply ashamed to be standing here before you today. I am the one solely responsible for being here. I know I am here because I mistreated some of my athletes that I coached and because I structured withdrawals from the bank in the hope of keeping mistreatment hidden, and also I misled the FBI in 2015 about what happened in the past.

For 11 months, I have been struggling to come to terms

with events that occurred almost four decades ago. I have more work to do in that regard. But I also committed to doing it and doing it with the help of professionals. I am now working to regain my health back.

The thing I want to do today is say I'm sorry to those I have hurt and misled. First I wanted to apologize for the boys I mistreated when I was their coach. What I did was wrong, and I regret it. They looked to me, and I took advantage of them. Today I accept what Ms. Burdge and Mr. Cross have said, and I apologize to them and to their families.

I also want to apologize to the government for misleading them in my interviews in December 2014 and February of 2015. Federal agencies I deeply respect were misled by me. This alone is a source of great shame for me.

I apologize to my constituents and my supporters, who I tried to serve honorably for so many years, and also my colleagues who I served with.

I apologize to my family and friends for my being here and for subjecting them to everything that has happened in the past 11 months. They lost their privacy, and my family members lost positive association with the family name.

I'm so very thankful for everything that my wife Jean and my sons Ethan and Josh have done to support me and to take care of me during this illness.

I apologize to the Court and to the people of the United States and stand here ready to accept the sentence that you are about to impose on me.

Thank you, Judge Durkin, for listening to these statements.

THE COURT: Mr. Green, your client doesn't have to answer the question, but I have a question --

MR. GREEN: Yes, sir.

THE COURT: -- of Mr. Hastert. And he's free to answer it, but he can talk to you first.

You said you mistreated athletes. Did you sexually abuse Mr. Cross?

THE DEFENDANT: I -- I don't remember doing that, but I accept the statement.

THE COURT: Did you sexually abuse Victim B?

THE DEFENDANT: Yes.

THE COURT: All right.

All right. And how about Mr. Reinboldt? Did you sexually abuse him?

THE DEFENDANT: It was a different situation, sir.

THE COURT: If you want to elaborate, this is the time to do it.

(Counsel and defendant conferring.)

THE DEFENDANT: I -- I would accept Ms. Burdge's statement.

THE COURT: So you did sexually abuse him.

THE DEFENDANT: Yes.

THE COURT: All right. Okay.

You can have a seat, unless there's anything else you want to add.

MR. GREEN: No, sir.

THE COURT: Mr. Green, anything else you wish to say?

MR. GREEN: No, sir, not at this time.

THE COURT: Anything else from the government?

MR. BLOCK: No, your Honor.

THE COURT: All right. You can all have a seat.

First thing I intend to do is impose conditions of supervised release. And I'm going to go through those conditions, make sure the defendant understands them and make sure that the -- if there is an objection from either side, I hear what those objections are and I'll rule on them.

I'm going to impose a period of supervised release of two years. I'll deal with the issue of custody in a moment.

Within 72 hours of any release from custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district in which he is released.

He should comply with the following mandatory conditions of supervised release:

He should not commit another federal, state, or local crime; not unlawfully possess a controlled substance; and

cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

These are mandatory conditions that the law requires, and no further explanation is needed.

The defendant is also required to comply with the following discretionary conditions of supervised release:

Defendant shall refrain from knowingly meeting or communicating with any person whom the defendant knows to be engaged or plan to be engaged in criminal activity and from knowingly meeting or communicating with the following persons: Individual A, Individual B, Individual C, and Mr. Cross.

He shall refrain -- and that's necessary because these were victims of the defendant, and he should not contact them. If they want to reach out to him, that's their prerogative, but he should never contact them himself. And that's necessary to protect the victims.

Should refrain from possessing a firearm, destructive device, or other dangerous weapon because he's a convicted felon, and possession of such items is itself a crime.

He should remain within the jurisdiction where the defendant is being supervised, with a map being provided to the defendant by the probation officer at the inception of the supervised release period, unless granted permission to leave by the Court or probation officer.

This is necessary so they know where he is, so they

can report on his activities while he's on supervised release.

He should report to a probation officer as directed by the Court or a probation officer.

He should permit a probation officer to visit him at any reasonable time at home or any other reasonable location specified by the probation officer and permit confiscation of any contraband observed in plain view of the probation officer.

This is necessary, again, to allow the probation officer to keep track of what the defendant is doing.

Should notify a probation officer promptly, within 72 hours, of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer; and he should also notify the probation officer promptly, within 72 hours, if arrested or questioned by a law enforcement officer.

These are the general conditions of supervised release. Are there any objections from the defendant to those?

MR. GREEN: No, sir.

THE COURT: All right. I'm also going to impose the following special conditions of supervised release, and these are necessary because of the defendant's history of sexual misconduct.

He shall participate in a sex offender treatment program. The specific program and provider will be determined by a probation officer. The defendant shall comply with all

recommended treatment, which may include psychological and physiological testing.

Is there any objection to that condition by the defense?

MR. GREEN: No, sir.

THE COURT: All right.

And, finally, if the probation officer determines that the defendant poses a risk to another person, including an organization or members of the community, the probation officer may require you to tell the person about the risk. You must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions, and the probation officer may contact the person and confirm that you have told the person about the risk.

Any objection to that condition?

MR. GREEN: No, sir.

THE COURT: All right.

Are there any other conditions of supervised release that the government is recommending that I have not imposed?

MR. BLOCK: No, your Honor.

THE COURT: Any that the probation officer is aware of that I should -- that you recommend I impose?

MS. KIECKHAFER: No, your Honor.

THE COURT: All right. Those will be the conditions of supervised release.

The Supreme Court in an opinion issued exactly one week ago today, in the case *Molina-Martinez v. United States*, said that the sentencing guidelines are to be the sentencing court's starting point and initial benchmark. The district court must begin its analysis with the guidelines and remain cognizant of them throughout the sentencing process. The guidelines are the framework for sentencing and anchor the district court's discretion.

Even if the sentencing judge sees a reason to vary from the guidelines, I need to use the sentencing range as the beginning point to explain the decision to deviate from it. The guidelines in a real sense are the basis for any sentence.

The Supreme Court said the guidelines are not only the starting point for most sentencing proceedings but also the lodestar. Court noted that in less than 20 percent of the cases since 2007 have district courts imposed sentences above or below guideline sentences absent a government motion relating to cooperation.

In the three and a half years I've been a federal judge, I've sentenced about 45 defendants. I can think of only two instances where I've gone above the government's recommendation and a number of times where I have gone below the government's recommendation. But the facts of each case are, of course, different.

I have the discretion to vary the sentence either

above or below the guideline range because the guideline range is advisory and not mandatory.

I'm required to consider the Section 3553(a) factors I set forth earlier and impose a sentence that's sufficient, but not greater than necessary, to comply with the purposes of sentencing.

There may be some question as to why allegations and admissions of sexual molestation of children have any basis and any business being considered in a federal sentencing proceeding relating to a structuring offense.

When a defendant is sentenced, Congress provided that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

The only limits on this are expressly enumerated. Characteristics like race, national origin, and religion may not be considered at sentencing, and whatever information is considered, it must be accurate.

The burden of proof as to the accuracy at the sentencing hearing is by the standard of a preponderance of the evidence, and any findings I make today will be pursuant to that standard, noting that as to some conduct, the defendant himself has not challenged its accuracy.

The law requires I consider a number of factors when

sentencing any defendant. And among those factors are the history and characteristics of the defendant and the nature and circumstances of the offensive.

If I am going to consider the good history and characteristics of the defendant, I must also consider the bad, which is that the defendant is a serial child molester. And the nature and circumstances of the offense include the child molestation because it was unquestionably the motive for the structuring and the lies that followed it.

The motive itself is an aggravating factor. One reason the motive aggravates the underlying crime of conviction is because the sex abuse was and is conduct that the public should know about -- conduct about children under the supervision and care of an adult -- and concealing it, no matter how old, hides something important.

The first thing I must consider under Section 3553(a) is the nature and circumstances of the offense. The structuring offense, although obviously a federal felony, is not typically a charge that's brought when the funds that are the subject of structuring are lawfully obtained and properly taxed, which was the case here.

But I don't in any way criticize the FBI, the IRS, or the U.S. Attorney's Office for conducting the investigation. In this case, from June 2010 to April 2012, the former Speaker of the House of Representatives made 15 $50,000 cash

withdrawals from three different banks.

In April 2012, when the banks questioned him about the withdrawals and explained that Currency Transaction Reports were being filed, the defendant challenged the bank and lied by saying he was using the cash to buy antique cars and buying stocks and then said he just wanted to make sure his money was fully insured.

All of these explanations were preposterous. When told that cash transactions greater than $10,000 had to have paperwork filed relating to them, he decided to make his withdrawals in amounts less than $10,000.

From July 2012 to December 6, 2014, the defendant withdrew $952,000 in cash on 106 separate occasions, each time withdrawing less than $10,000. The sheer time and effort required to accomplish these transactions is mind-boggling.

In total, from 2010 to 2014, a total of 1.7 million in cash was withdrawn from various bank accounts and paid to Victim A.

And I'm calling him Victim A because these people are victims. They're not individuals; they're victims.

There should be no mistake that what the defendant did regarding the structuring laws was a crime. It doesn't matter that it was his money, that it was lawfully earned, and it was properly taxed. The legislative history of the law, which I have reviewed, makes clear that the Congress intended the law

to apply to your situation. There's no intent by Congress to draw a distinction between structuring where the money was derived from illegal transactions and schemes and money based on legitimately earned funds.

The courts have held that intentional violations of the reporting requirements constitute criminal conduct regardless of the core legality of the money at issue. The 7th Circuit in *United States v. Davenport* said, "The statute clearly condemns the act of evasive structuring, regardless of whether the money involved is 'dirty' or not. It is hard to imagine how the language could be clearer. If Congress had intended that structuring for the purpose of evading reporting requirements would be illegal only when connected to other criminal conduct, it could easily have done so."

And to the extent the defendant didn't know this law, which is of course, again, preposterous, he was given what was called a CTR Reference Guide by his bank when they questioned all of his $50,000 cash withdrawals. It was written in plain, simple English, not in complicated legalese. It was a one-page document. And part of it read as follows:

"Q: Can I break up my currency transactions into multiple smaller amounts to avoid being reported to the government?

"A: No. This is called 'structuring.' Federal law makes it a crime to break up transactions into smaller amounts for the purpose of evading the CTR reporting requirement,

and this may lead to a required disclosure from the financial institution to the government. Structuring transactions to prevent a CTR from being reported can result in imprisonment for not more than five years and/or a fine of up to $250,000."

The government very appropriately investigated this case. What rational person takes out $1.7 million in cash out of a bank over four and a half years in a series of 50,000 and $9,000 withdrawals?

Add to it that the person who is doing it is the former Speaker of the House, and you have a set of circumstances that cry out for investigation.

I don't care whether the money was lawfully obtained, which it was. I don't care whether the money was fully taxed, which it was. I don't care if people think this regulation is ill-advised and not meant for people who are dealing in lawfully obtained and fully taxed cash. I don't care if people think it ought to only be used against drug dealers.

The structuring law was known by the defendant. He had some role in passing it. And to the extent he was ignorant of it, the bank fully advised him what the law was, and then he proceeded to find ways to work around the law. That law applies to every citizen, and the prosecution of the defendant for violating that law was entirely appropriate.

And the defendant was appropriately charged in this

case. In my 13 years as an Assistant U.S. Attorney and 20 years as a defense attorney and the three and a half years I've been a judge, I have never seen a more obvious and clear-cut violation of the criminal structuring laws.

Now, structuring, the offense the defendant has pled guilty to, takes its character from the underlying conduct. And the underlying conduct was the sordid secret that the defendant was worried would be exposed, that the defendant was a serial child molester.

So special agents of the FBI and the IRS spent the time and effort to track down all of these transactions. At this point the FBI knew nothing of Victim A. All the FBI knew was that the former Speaker of the House had withdrawn extraordinary amounts of cash from a number of banks in a manner obviously intended to evade federal reporting requirements.

But the effort to prevent the banks from filing proper reports was almost beside the point. The FBI's immediate and understandable question was, what on earth is going on? Is the former Speaker of the House, and someone who was engaged in international lobbying since his time in public service, the victim of some extortion or blackmail plot by a foreign government or foreign entity?

Was this person who was privy at one time to the nation's greatest secrets involved in some type of official

misconduct dating back to his years with the government? Was there some type of national security problem involved in light of the size of the withdrawals?

Remember, these weren't checks; they're not money orders; they were not wire transfers. This is cash. Common sense tells you you don't pull out cash out of a bank in these amounts and with this frequency unless there's something nefarious going on. That's why there are reporting requirements for these transactions.

It's possible there will be an innocent explanation. Cash is legal, of course. People can be eccentric, but that's the exception, and no one ever thought the defendant as being an eccentric person.

So it's perfectly understandable that law enforcement would have been concerned by the defendant's cash withdrawals. So once they learned of the scope of the cash withdrawals, the FBI interviewed the defendant at his home. He didn't know they were coming, but the FBI is not legally required to provide advance notice of an interview to give a person time to lawyer up.

And since the FBI believed the defendant might have been compromised in some way, it would have been unwise to inform him in advance of the visit, not knowing if making an appointment itself would put the defendant in danger. Whatever the government's intent, whether they knew he was obviously

engaged in structuring, which I believe they were, whether they were trying to find out what the explanation for all this was, which certainly was one of their purposes, they were acting well within their rights as investigators.

The interview was taped without the knowledge of the defendant, and that is perfectly legal and ensures there is no ambiguity about what was said.

Every person has three choices when interviewed by the FBI. The first, of course, is to tell the truth. Now, if the truth is incriminating, embarrassing, shameful, or uncomfortable, so be it. It's still the truth.

Your second option is to exercise your right to have a lawyer present before you answer any questions. Even the most unsophisticated individual is aware of this right. The defendant is, of course, not unsophisticated. If you don't want to talk to the FBI because of fear or shame in disclosing the truth, then you say you want a lawyer and you don't want to discuss things further.

I listened to the tape recording of that interview a number of times. I relied on the tape and not on the transcripts, so I know exactly what was said and, more importantly, know the mood and tone of the interview.

There is no question in my mind the defendant knew he was in trouble because he might have to disclose the secret he didn't want to tell anyone. He knew about his dark side, but

the FBI didn't. This is apparent from the first question they asked the defendant, which was "Are you and your family safe?"

The FBI was doing its job, investigating whether the former Speaker of the House and current international lobbyist had gotten himself in a bad or compromised position with a foreign government or criminals. So the FBI is doing its job, and the defendant chooses neither to tell the truth nor ask that questioning stop until he gets a lawyer. Instead, he takes the third option and lies.

One factor judges look at in a sentencing is to see if the crime was a one-time lapse in an otherwise exemplary life. This is one of many moments in this case where the defendant had a choice, and he chose the wrong path.

Now, in the defendant's submissions to the Court, his counsel has done a commendable job of trying to slice and dice the defendant's conversations with the FBI to show that the questions were not perfectly phrased, that it was a fluid interchange, and that the defendant's answers were ambiguous.

Certainly interviews are not conducted in the same type of formal atmosphere present in the courtroom where questions are properly phrased, answers are precise, and a judge referees the situation so there are no misunderstandings. Instead, interviews are conducted in the real world.

As I said, I listened to the tape a number of times. There is no question in my mind, and I specifically find the

defendant lied and intentionally misled the FBI as to the reason he took the cash out of the banks. And in his plea agreement, he admitted that he intentionally concealed from the agents that he withdrew the $1.7 million over the last four and a half years to compensate Victim A and concealed the reason he was compensating Victim A.

When he said he was keeping the cash in a safe place, he made the statements to mislead the agents as to the actual purpose of the withdrawals and what he had done with the money. And lying is not an acceptable option. It's not an acceptable option for the uneducated or poorly educated defendants that come before me, and it's not an acceptable option for someone as sophisticated and as intelligent as the former Speaker of the House of Representatives of the United States Congress.

If you told the truth, I'm not sure we'd be here today. Instead you lied, and here we are. You didn't take the cash out of the bank because you didn't trust banks. You didn't take the money out of the bank to buy antique cars. You took the money out of the bank to pay a person you sexually abused many years ago. I can understand why you didn't want to admit that to the FBI, and in that case, you should have sought the advice of a lawyer before you answered.

But when you decided to answer, you assumed the obligation to tell the truth or else commit a federal felony. You chose the latter. That conduct is more serious than your

decision to illegally structure withdrawals of legally earned and fully taxed money.

And why is it serious? Lying to the FBI is not a new law. Its origins date back to a statute enacted in 1863, and the current version of the law has been in place since 1948. There have been countless convictions across the country of people who have lied to the FBI and thereby been found guilty of a violation of 18 U.S.C. 1001. This is not some new designer regulation that a naive and unsophisticated person fell prey to. Congress made lying to the FBI a felony because of the chaos that would ensue if people thought they could lie and get away with it.

The FBI investigates serious crimes. They investigate not only wrongdoing that has already occurred, but just as importantly, they conduct investigations to prevent harm from occurring in the future. There's only so many FBI agents available, and they don't lack for assignments. It is an enormous and dangerous waste of resources for the FBI to spend time on a wild goose chase based on lies, and that is what the defendant caused to happen in this case. It's even more deplorable when it's caused by a person who knew better.

Were this only a case about structuring of funds which were legally obtained and taxed, there is some question whether the prosecution would have occurred. And even if the prosecution had occurred, a sentence of probation would likely

be appropriate.

I asked the U.S. Sentencing Commission for data regarding sentences imposed across the country on offenders sentenced for structuring transactions. I specifically asked for those sentences where the safe harbor applied where the funds were not from an illegal source and were not used for unlawful purposes.

Out of the 78 offenders sentenced between years 2010 and 2014, 65 of those offenders received probation, four offenders received some type of split sentence involving community confinement and imprisonment, and only nine of the 78 offenders were actually sentenced to a period of straight incarceration.

I then asked them to run data -- the same data, only calculating it for people who had no criminal history at all. Of the 66 offenders in that category, only seven received a period of incarceration, and even then, the average length of imprisonment was four months.

This case is different from those cases. Accusing Victim A of extorting you was unconscionable. You tried to set him up. You tried to frame him. Because you told the FBI that Victim A was falsely accusing you of child molestation, the government pulled Victim A's bank records, put a pen register on his phone lines, pulled toll records, pulled phone records, surveilled him, and pulled bank records of his family.

The full weight of the federal government's investigative resources were thrown at him. You caused that; no one else did. And he didn't deserve it. He was a victim once decades ago, and you tried to make him a victim again.

There are things we try to protect in our society, and we try to protect people from being falsely accused of crimes. You were willing to use your credibility and your stature as the former Speaker of the House of Representatives to convince the government you were being extorted. You manipulated the FBI and the U.S. Attorney's Office, and that's a big problem for you.

You also lied about not sexually abusing other members of the wrestling team. Your admission to the accusations of Victims B and D showed the lie. And you made those lies to make your lie about Victim A more credible. The parties have agreed that your statements to the government can be considered by me, and I find this an extremely aggravating factor that sets this case apart from garden-variety structuring cases.

Your attorney has suggested that somehow at the time that was going on, you were somehow -- I don't know it would be mentally compromised, but in a position where you didn't understand what was going on and were making poor decisions. At the time this was going on, sir, you were a lobbyist with Dickstein & Shapiro, a large D.C. firm. And I'm simply going to read what was reported in the presentence report at that

time.

You were paid $75,000 a month. I don't believe you were mentally compromised and didn't know what you were doing. "The defendant reported he was employed as a senior adviser and voluntarily ceased this employment subsequent to the filing of the indictment in the instant case." So you worked there until May of 2015.

According to the defendant's bond report prepared by the U.S. Pretrial Services Office, "The defendant reported he has traveled extensively for business between approximately 2005 and 2015. Specifically, he related he traveled to Japan in May 2015. He has also traveled to Singapore, China, Korea, Turkey, Luxembourg, Germany, England, Colombia, Brazil, Lithuania, Canada, Panama, and Peru."

I believe the actions you took when you tried to set up Victim A were intentional, were thought-out, were desperate, but were not something you didn't -- where you didn't know what you were doing.

I received many letters in this case, and I read every one of them. But there was one that struck me as particularly appropriate. It was from SNAP, Survivors Network of those Abused by Priests, letter I received April 25th. And I'll read one paragraph of it:

"Denny Hastert dramatically increased suffering to his victims by his false allegations that one of his victims was

extorting money from him. The deliberate and calculated deception might have ended differently. The one-time victim who Hastert sexually violated and robbed of his innocence had already suffered for decades but might have also ended up in prison.

"Hastert tried to portray himself as the victim and someone who needed law enforcement's help, falsely claiming that someone was extorting money from him. As a powerful politician, he may have succeeded and Victim A may have been forced to endure horrific additional suffering, being indicted and punished for a crime he didn't commit. Hastert was willing to allow that to happen, even potentially sending an innocent man to jail, in an effort to deep his dirty secrets hidden."

I agree with that letter.

Now, one of the other factors I must consider is the history and characteristics of the defendant. Your lawyers have presented your public side, which is a lifetime of good works in service to the community. I don't take a cynical view of people who serve in the legislature. The political side of public service often obscures the good that elected officials do.

There are public servants who often sacrifice what could be an easier or more lucrative existence in the private world in order to help their constituents. The best of them know that the position is greater than the person and treat the

job with respect. We are a great nation because people do that, and I admire people who are willing to make that sacrifice. You made that sacrifice.

Those who are leaders among legislators are the most admired and respected by members of the community. The Speaker of the House is among the most respected positions that any United States citizen can hold. Indeed, it's also one of the most powerful by virtue of the number of circumstances, including the laws of presidential succession.

The letters that I received in support of the defendant were what I would have expected. I received one as recently as this morning. They describe an exemplary person in all his personal, professional, and political dealings. A large number of people respect him, and he's done numerous things that should be respected. There are many tales of good deeds, both large and small. People described how their lives were positively impacted by being in contact with Dennis Hastert, even after his public service ended.

He cared deeply and worked effectively for his country and his congressional constituents. Letters I received came from all walks of life, and they're filled with examples of good deeds, and they're often unsolicited good deeds performed by the defendant. These are from people who worked with him, people would worked for him, and people who simply knew him from the community. It is unquestioned that he has done a lot

of good for people, and no rational, unbiased person who read the many letters regarding him that I received would feel differently.

The irony is that many of the letters came from people that Mr. Hastert taught and coached in high school. Letters described him having made a positive impact on their lives. Many of the people who wrote were from his former staff, and others had jobs in the capital. They all viewed him simply as "a good man."

I received a poignant letter from the defendant's wife and heartfelt, well-written letters by his sons. They describe the defendant as a good husband and a good father.

Just as I was besieged by letters about the good of Dennis Hastert, I must also consider the bad.

Positions of power and respect do not insulate a person from being held accountable for violations of the law. A person should not be unduly prosecuted and penalized because he was once powerful and influential. Similarly, a person is not entitled to any greater deference or privileges than any other citizen who commits criminal acts.

Some actions can obliterate a lifetime of good works. Nothing is more stunning than having the words "serial child molester" and "Speaker of the House" in the same sentence. Nothing is more disturbing than having the words "child molester" and "coach" and "teacher" in the same sentence. Both

sentences are true.

Your actions with the young people you abused violated the trust that students put in their teachers, their coaches, and their mentors. Your actions were cynical. You abused those who either wouldn't or couldn't cry out for fear they would not be believed and were trying to discredit a beloved coach, or for fear they would be ostracized by their friends.

How many teenagers simply want to fit in? How many teenagers simply don't want to be embarrassed, don't want to have the light shined on them, and just want to be part of a crowd? Can you imagine the whispers, the finger-pointing, the sideways glances if you're a 14-year-old boy and you accuse the town hero of molesting you?

Anyone who lived in the '70s knows it's different than today. Today no one would let a coach sit in a chair in front of the boys' shower. But in the '70s, when you were the coach who brought the school a state wrestling championship, you could get away with that stuff. Back then, people blindly put their trust in kids' teachers and coaches. And your breaking of that bond of trust is all the worse because of who you were.

Parents are going to think twice about the safety of their children with teachers and coaches because if Denny Hastert, Speaker of the House, everybody's friend, everyman, could do it, then anyone could do it.

There's a suggestion in the defense submission that

the actions of the defendant relating to Victim A were ambiguous. I reject that characterization.

The undisputed facts are these. In the late '70s, the defendant took 10 to 14 boys from the Yorkville High School wrestling team to a wrestling camp in Colorado. Victim A was younger than many of the other boys on the trip. During the trip, the team stayed two nights in a motel during the drive back.

When they arrived at the motel, the other boys teased Victim A, saying that he would have to spend the night in the defendant's room. Victim A didn't know why the other boys were teasing him, and he was not concerned about it because he had known the defendant since he was seven years old and the defendant was a friend of his family.

Later, the defendant did tell the boys that they would all stay in a room together while Victim A would stay with him. Victim A didn't understand why he was singled out to go to the room with the defendant.

When it was time for bed, Victim A went to the defendant's room. Earlier in the trip, Victim A had complained about a groin pull. While in the hotel room, the defendant asked about Victim A's injury and said he wanted to check on it.

The defendant told Victim A to lie down on the bed and take off his underwear. The defendant then began massaging

Victim A's groin area. It became clear to Victim A that the defendant was not touching him in a therapeutic manner to address a wrestling injury but instead was touching him in an inappropriate sexual way.

A few moments later, this 14-year-old jumped off the bed, grabbed his underwear, ran across the room, and slunk into a chair. He was confused and embarrassed about his physical reaction to being touched, and he actually apologized to the defendant.

The defendant then asked Victim A to get on the defendant's back and give him a massage. Victim A was nervous about what happened and what was going on and didn't know what to do. The defendant lay on the bed in only his underwear, and Victim A gave him a back massage. Then they went to sleep in the same bed.

This occurred the summer before Victim A's freshman year in high school. He had just left eighth grade. He was 14 years old. There is nothing ambiguous about this. This is child molestation. It was sexual abuse.

And if there is anyone who thinks there is anything ambiguous about that recitation, the ambiguity melts away when the conduct of the other victims is factored in. The defendant performed a sex act on Victim B. The defendant doesn't deny it. The defendant performed a sex act on Mr. Cross. We heard that today. There's nothing accidental or ambiguous about the

molestation of Victim A, period.

And if in your own mind you didn't abuse Victim A, why pay him $3.5 million? Because of fear he would reveal it and ruin you? I don't buy it. If there's no truth to it, then there is no ruin. It's just the unsupported allegations of someone decades too late.

You weren't running for public office then when Victim A approached you. I believe you weren't afraid of being ruined because of unsupported allegations. You were afraid that the rest of the victims would come forward if Victim A did. And if the rest of the victims came forward, then the secret is out, and the victims will finally be believed.

The obvious motive for your lies is not lost on me. If you didn't hide this and keep it a secret, you never would have been a state representative; you never would have been a congressional representative; you never would have been Speaker of the House.

I also find aggravating that a person with your education and background engaged in the crimes here. I can't tell you how many defendants come before me, standing right at that podium, come from broken homes, no fathers around. Their family life is -- pervades with poverty, drug addiction, alcoholism, mental health issues, sexual abuse, physical abuse. They live in horrible neighborhoods, have no role models, drop out of school.

These are people that come in -- many of these people come in; they never had a chance. They come before me having been found guilty of a variety of drug and gun offenses that are largely a product of their environment. They're capable of free choice. They're guilty of crimes. And I have to give them statutory mandatory minimums because of legislation requiring it. And that's the law, and I accept the law.

But it breaks my heart because many of these defendants didn't have a chance. They grew up in environments where the only surprising thing is they weren't in front of me sooner.

You had a good education. You didn't suffer poverty. This is another aggravating factor because you had a good life that didn't -- and you didn't have to make the choices you made. The criminal conduct here was not inevitable.

Had this conduct been uncovered near the time when it occurred, a grand jury sitting in Kendall County would have indicted you, a jury likely would have convicted you, and you likely would have been sentenced to decades in a state prison. Of course, your teaching and coaching career would have been over, and all of your public service would never have occurred. All the money you earned as a lobbyist would never have been earned.

But because the statute of limitations for your child molestation ran out many years ago, you can't be charged for

that. And I can't sentence you as a child molester. It's not what you were charged with, it's not what you've pled guilty to, and any sentence I give you today will pale in comparison to what you would have faced in state court.

But this conduct is relevant to your history and characteristics no matter how old it is. Some conduct is unforgivable no matter how old it is. If the juvenile victim of sex abuse can't forget decades later what happened, then neither can I as a judge nor can we as a society. The abuse was 40 years ago, but the damage lasts today. Mr. Cross made that clear.

The statements of the victims that the victims have given to the government and the statements of Ms. Burdge and Mr. Cross make clear it's not just the victims who were harmed; it's entire families who learn of the abuse and wonder how they weren't able to prevent it, how they failed to protect their child or their sibling.

What could be worse for a parent, knowing they entrusted their child to a coach, allowed them to go on overnight trips to wrestling camps, little knowing their child would be abused by the man they trusted. The shame and the angst family members feel because they failed to protect their child is palpable and adds to the damage here.

My sentence today can't legally or properly be a sentence for child molestation, and I don't want it in any way

to be perceived that the sentence here measures the harm caused by the child molestation. In the end, that would have to be a state court judge sentencing you for a conviction of child molestation, and the sentence in this case can never be as long as the time the victims and their families have suffered.

To Mr. Cross, he showed incredible courage coming in here today to testify. He didn't have to. The defendant is not contesting what he said occurred. I believed everything Mr. Cross said. It puts a face and a voice on the damage a teacher and a coach can cause by sexually abusing a student.

It doesn't go away. It just doesn't. It's hard to look at Mr. Cross, now in his late 50s, and know that this happened when he was 17 and he is still damaged.

And, Ms. Burdge, people will now believe you. I believe you. And through you, I believe your brother. He was tragically sexually abused by the defendant just like Victims A, B, C, and Mr. Cross. I hope this proceeding today brought you some amount of solace, despite these incredibly sad facts.

The rise of Dennis Hastert took decades, and it was a result of dedication, hard work, and ostensibly standing by his principles. The fall occurred in days and was as sharp and precipitous as could ever be imagined.

Losing your good name is a significant punishment. The defendant's good name is gone; it's obliterated. Cynics

will say, "So what? That's not real punishment." I disagree. It's a level of punishment. Any person in this room who values their good name would recognize that losing it is a form of punishment. And it's undoubtedly deserved, but that doesn't make it any less a form of punishment.

And if there is a public shaming of the defendant because of the conduct he's engaged in, so be it. When you hold yourself out as someone other than who you are, that exposure inevitably will be devastating. Having your portrait taken down from the Capitol is a significant public shaming, but it's simply not comparable to the damage suffered by a minor who has been sexually abused.

How difficult it must have been for years to hide these secrets. The defendant must have known that someday these victims would come forward. But that difficulty pales in comparison to the difficulty of the abuse victims themselves living with these secrets, knowing that people would not believe them, that people would hold them up to public scorn, that anyone who came forward would no longer just have the pain of being sexually abused; they'd have the pain of knowing no one believed them. Now people believe them.

I have to take into account a number of factors for sentencing. One is your age. Your age is a consideration, but it's not a critically compelling one to me. You're 74 years old. While your sexual molestations occurred decades ago, the

structuring offenses occurred when you were in your early 70s, and your lies to the FBI and your obstructive conduct by trying to set up Victim A also occurred when you were in your early 70s.

You committed crimes when you were elderly, so your age should not be an excuse to prevent giving you a custodial sentence. In fact, many elderly people are in jail in the federal prisons. As of January 2016, there were 4,601 federal prisoners over the age of 65.

While we all have a certain number of days left in our life, older people are obviously nearer to the end of their lives, so sentencing an elderly person to jail can be especially hard for that person because if you have limited foreseeable days on earth, you don't want to spend them in jail.

But as I said, if you're old when you commit crimes, the punishment imposed for that conduct necessarily occurs when you are old. Your age didn't prevent you from committing crimes; your age should not prevent you from being punished for those crimes.

I will also note, as I did earlier, that while the defendant is obviously elderly and ill, he is not an infirm, helpless, handicapped senior citizen who is not aware of what's going on. He called Mr. Cross's brother, asking for a letter of support for him to send to the Court.

The more important factor I must consider is the defendant's health. He is unquestionably a sick, frail man because of the health setbacks he suffered after his guilty plea. His lawyers reported his condition to me when I continued the sentencing that was originally scheduled to occur earlier this year. His lawyers submitted a very detailed letter from his doctor, Dr. Egly. Dr. Egly described serious health issues, saying the defendant needed 24-hour care and follow-up appointments with the specialists who treat him.

I wanted an independent expert to advise me on the defendant's condition. Dr. Robert Golden of Northwestern Hospital was a doctor who was jointly suggested by the government and the defense and who I independently vetted through a variety of sources.

I want at this time to thank Dr. Golden for his significant contributions to this case and the large amount of time he dedicated to it. Dr. Golden is an extremely competent, experienced, and careful doctor. He is a physician licensed to practice in the state of Illinois and board-certified by the American Board of Internal Medicine. He is an assistant professor of clinical medicine at Northwestern's Feinberg School of Medicine, and he has been practicing primary care internal medicine for 22 years.

I told Dr. Golden to review any records and speak to any people he needed to in his professional judgment in order

to assess the defendant's health. There were no limits placed on Dr. Golden. He examined all of the defendant's medical records, spoke to Dr. Egly and all the specialists, and examined the defendant himself.

I also wanted Dr. Golden to determine the defendant's ability to safely serve a custodial sentence should I decide to impose one.

Dr. Golden essentially confirmed Dr. Egly's finding that the defendant needs continuous care for his many health issues. Quite logically, he found that the defendant's ability to safely serve a custodial sentence depends on the defendant's current level of disability, his medical needs, and the services that are available at a federal correctional facility.

I had Dr. Paul Harvey, the regional medical director for the Bureau of Prisons, review the defendant's medical records, review a draft of Dr. Golden's report, and then issue a report himself. Dr. Golden spoke to Dr. Harvey, and then Dr. Golden issued his own final report.

Dr. Harvey wrote that based on the defendant's current health, if he is sentenced to a period of incarceration, he'd likely be designated to serve any such sentence in a Bureau of Prisons Level 4 medical facility. According to Dr. Harvey, Level 4 inmates are those who require services available at a medical reference center and may require daily nursing.

Examples of such conditions are those with cancer in

active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical patients, or acute psychiatric illness requiring inpatient treatment.

Dr. Harvey wrote in his letter that the Bureau of Prisons has six medical referral centers, five of which admit men, located in Devens, Massachusetts; Butner, North Carolina; Lexington, Kentucky; Springfield, Missouri; and Rochester, Minnesota.

Any one of these medical referral centers -- at any one of these medical referral centers, Mr. Hastert will be able to continue his physical therapy regimen with in-house physical therapists and receive assistance with his activities of daily living from nursing staff or trained inmate companions.

Significantly, the MRC facilities have clinical staff available in house 24 hours per day and have contracts with community specialists for additional review and/or care if clinically necessary.

Regarding concerns related to the management of Mr. Hastert's diabetes, it's important to note that the BOP cares for thousands of diabetic patients. While most institutions have set times where diabetic inmates may check their blood sugar and receive injections, some institutions have experimented with providing diabetic inmates with their own personal glucometers and insulin pumps.

He goes on to talk about the various ways in which

diabetic patients are treated in these facilities.

Regarding Mr. Hastert's medication, the BOP has a national drug formulary similar to formulary lists used by private medical insurance companies. The formulary is a list of medications the bureau's medical staff consider to be high-quality, cost-effective medications for the inmate population. Medications are constantly reassessed and extensively reviewed for inclusion, exclusion, or restriction in the formulary based on evidence-based medical practice and security concerns.

He goes on to talk about how the necessary medications are provided to inmates and also how they provide medical equipment to inmates, if necessary, whether it be a wheelchair, CPAP machines, or a walker.

Once Dr. Golden reviewed Dr. Harvey's report and interviewed Dr. Harvey, he reached the following conclusion: "In recent months, Mr. Hastert suffered from a catastrophic and life-threatening illness resulting in significant disability. He also has medical conditions that put him at risk for complications. I had concerns regarding the level of care and attention that would be available to manage his risks and disabilities via the Federal Bureau of Prisons, but a careful review of his needs and the array of services that would be available to him in the Bureau of Prisons medical referral centers has reassured me that his needs can be met."

The defense delivered a submission on Monday expressing concerns that Dr. Harvey's evaluation and derivatively Dr. Golden's conclusion is at best naive and overly trusting of the ability of the Bureau of Prisons to care for someone in the defendant's condition. I carefully reviewed that submission. I spoke to Dr. Harvey about it late last night. A BOP hospital is not Northwestern Memorial Hospital. It's not even Copley Hospital where the defendant was treated. It's still a jail, and the amenities of a private hospital are not there.

But I am satisfied based on Dr. Harvey's report, Dr. Golden's report, my discussion with Dr. Harvey, and, finally, a discussion I had with the warden of the BOP facility in Rochester yesterday that the defendant's vital health needs will be met if he is incarcerated.

Mr. Wise expressed concerns that inmate populations who help provide services to wheelchairbound patients are poorly trained and may abuse Mr. Hastert because of the child molestation facts that have arisen here. The warden assured me that they carefully screen and train these companion inmates and that if a prisoner needs specialized help, full-time aides perform that task. They have a large contingent of medical staff available 24/7, along with full-time correctional officers and nurses who are always present.

Surprisingly, a significant percentage of the

prisoners at Rochester are sex offenders, so if this defendant is designated there, he will not be singled out because of his molestation background. He'll be joining others who have similar backgrounds.

If the defendant needs an examination by a specialist, the prison has a contract with Mayo Clinic, and the examination will occur there. People travel all over the world to go to Mayo Clinic. That's where Rochester Bureau of Prisons inmates go if they need a specialist. If the defendant ends up at another Level 4 medical jail, it will also be associated with a fine hospital, usually a teaching hospital.

There are no guarantees the defendant won't get sicker in jail, just as there are no guarantees he won't get sicker at home. But the Bureau of Prisons holds prisoners older and sicker than the defendant and provides them adequate health care. They will do the same here if I sentence the defendant to jail.

Finally, if the defendant's health suffers precipitously in jail, the warden told me they act aggressively to process a compassionate care release for the prisoner so the case returns to me for resentencing and release.

But for the age and, more importantly, the genuine health issues of the defendant, the sentence I am about to impose would be significantly greater. The defense wants me to impose a sentence of probation. Any sentence of straight

probation would be inappropriate.

There is a symbolism society attaches to jail. It means that the conduct is not permissible or accepted in society.

I'll agree with you, Mr. Green, this is a tragic and sad case. It gives me no pleasure to sentence someone like Mr. Hastert to a period of incarceration. It's sad for our country. He's the former Speaker of the House. It's sad for the victims because it's his conduct that he did with them that brought him here. This is tragic and sad from every level.

The government is recommending a guidelines sentence, meaning between zero and six months in jail. I understand why they agreed to make that recommendation. As a prosecutor, I understand -- former prosecutor, I understand that you make plea agreements such as that to help facilitate a plea and respect the wishes of victim witnesses who would prefer not to have to testify in court.

So I don't criticize the government for their recommendation, but I believe it also is inappropriate. It's not sufficient to comply with the purposes of sentencing. It doesn't reflect the seriousness of the crime and the conduct surrounding it. It will not promote respect for the law or provide just punishment for the offense to give simply a guidelines sentence.

I'm going to sentence the defendant to a period of

15 months' incarceration. I believe that sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

So it will be the sentence of the Court -- pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the defendant, John Dennis Hastert, is hereby committed to the custody of the Bureau of Prisons, to be imprisoned for a total term of 15 months on Count II.

It's ordered the defendant shall pay a fine to the United States in the amount of $250,000, which is due within 30 days of sentencing. The monies go into a crime victims fund, which is entirely appropriate in this case.

The defendant is ordered to pay a special assessment fee of $100, which is due immediately.

To the extent costs of incarceration are imposed or can be imposed by the Bureau of Prisons, they're not waived.

As I said earlier, the term of supervised release will be two years, and I'm not going to repeat the period -- or the different conditions of supervised release.

I should tell the defendant you can appeal your conviction, which was a guilty plea, if you believe your guilty plea was somehow unlawful or involuntary or if there's some other fundamental defect in the proceedings that were not waived by your guilty plea.

You also have a statutory right to appeal your

sentence under certain circumstances, particularly if you think the sentence is contrary to law.

Any notice of appeal must be filed within 14 days of the entry of judgment, or within 14 days of the filing of a notice of appeal by the government.

If requested, the clerk will prepare and file a notice of appeal on your behalf. And if you can't afford to pay the costs of an appeal or for appellate counsel, you have the right to apply for leave to appeal *in forma pauperis*, which means you can apply to have the Court waive the filing fee.

On appeal, you may also apply for court-appointed counsel.

Is there a dismissal of the other count of the indictment by the government?

MR. BLOCK: Yes, your Honor. The government moves to dismiss Count I of the indictment.

THE COURT: That motion is granted.

We need to set a surrender date. Mr. Green, do you have a suggestion as to that?

MR. GREEN: Well, your Honor, I mean, I think any surrender date should be linked to the availability of placement at a Level 4 institution.

THE COURT: I agree completely. We can -- I believe the designation process, Ms. Kieckhafer, can begin immediately. Is that correct?

MS. KIECKHAFER: That's correct, Judge.

THE COURT: All right. Once the designation process is completed and he has been designated to a particular facility, I'd like you and the government to come back in -- the defendant's presence will be waived -- and we'll set a firm surrender date at that time.

MR. GREEN: Very well.

THE COURT: I don't want him surrendering any place other than a Level 4 facility. If the designation is not at a Level 4 facility, I want you back because I'm going to ask you to come back, along with a representative of the Bureau of Prisons, to find out why not.

MR. GREEN: All right.

THE COURT: This is not meant to be a death sentence. He has serious health issues. They can be addressed at a Level 4 facility, and I want them addressed there.

So once the designation has occurred, you, Mr. Gallo, and the government can come back, and we will set a firm surrender date.

The Bureau of Prisons recommends the surrender date be early in the week, and they also recommend it be early in the day. I'll allow him to self-surrender.

Are there any other matters that need to be covered? First I'll ask the government.

MR. BLOCK: Can I have one moment, your Honor?

THE COURT: You may.

(Counsel conferring.)

MR. BLOCK: Your Honor, we'd ask the same bond conditions to stand while the defendant is out of custody.

THE COURT: They will.

Any other matters to cover from probation?

MS. KIECKHAFER: No, your Honor.

THE COURT: And from the defense?

MR. GREEN: No, sir.

THE COURT: Nothing today gave me any pleasure at all. This is a horrible case, a horrible set of circumstances, horrible for the defendant, horrible for the victims, horrible for our country. I hope I never have to see a case like this again.

We're adjourned.

THE CLERK: All rise.

(Concluded at 11:54 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ LAURA R. RENKE* *April 29, 2016*
LAURA R. RENKE, CSR, RDR, CRR
Official Court Reporter